Arnold **PRIETO**, TDCJ No. 999149, Petitioner,

v.

Douglas **DRETKE**, Director, Texas Department of Criminal Justice, Correctional Institutions Division, Respondent.

No. SA–01–CA–1145–OG.

United States District Court, W.D. Texas, San Antonio Division.

July 7, 2005.

---

J. Scott Sullivan, Attorney at Law, Richard Emil Langlois, Langlois & Snyder, San Antonio, TX, for Petitioner.

Edward L. Marshall, Assistant Attorney General, Austin, TX, for Respondent.

## MEMORANDUM OPINION AND ORDER DENYING RELIEF

GARCIA, District Judge.

Petitioner Arnold Prieto filed this federal habeas corpus action pursuant to Title 28 U.S.C. Section 2254 challenging his March, 1995, Bexar County capital murder conviction and sentence of death. For the reasons set forth below, petitioner is not entitled to federal habeas corpus relief but is entitled to a Certificate of Appealability on a pair of legal issues.

### I. Statement of the Case

#### A. The Offense and Aftermath

##### 1. The Crime Scene

There is no genuine dispute as to the operative facts concerning petitioner's offense. On Sunday afternoon, September 12, 1993, Maria Luisa Rodriguez visited the home of her mother-in-law and father-in-law, Virginia and Rodolfo Rodriguez, where she discovered the bloody, lifeless, bodies of both her elderly in-laws, along with the body of their houseguest, ninety-year-old Paula "Lupita" Moran.[1] Autopsies revealed that each victim had been stabbed numerous times and had received multiple, potentially fatal, injuries.[2] Examination of

---

1. Statement of Facts from petitioner's trial (henceforth "S.F. Trial"), Volume XX, testimony of Maria Luisa Rodriguez, at pp. 65–74.

2. The Bexar County medical examiner who conducted the autopsies of the three victims testified at petitioner's trial that (1) 72–year–old Rodolfo Rodriguez had received 17 wounds to the chest, side, and back of the head, (2) 6 of Rodolfo Rodriguez's wounds were potentially fatal because they penetrated either the pulmonary artery, the heart muscle,

the crime scene yielded no sign of forced entry but clear indications that a padlock on a front bedroom closet door had been opened by force.[3]

### 2. The Interview of Jesse Hernandez

Acting in response to a series of anonymous tips from a female Crime Stoppers caller in the months following the murders, on March 3, 1994, law enforcement officers interviewed Jesse Hernandez, the great-nephew of Virginia Hernandez, in Carrollton, Texas.[4] Based on information they obtained during that interview, law enforcement officers obtained warrants for the arrest of petitioner and Jesse Hernandez's older brother Guadalupe.[5]

### 3. Petitioner's Arrest and Confession

Petitioner was arrested during the early morning hours of March 4, 1995.[6] After being warned of his *Miranda* rights both

---

or a lung, (3) several of Rodolfo Rodriguez's wounds bore an unusual x-shape likely caused by a phillips-head screwdriver, (4) some of Rodolfo Rodriguez's hand wounds appeared to be defensive in nature, and (5) Rodolfo Rodriguez's cause of death was multiple stab wounds, which caused him to bleed to death. S.F. Trial, Volume XXIII, testimony of Jan Garavaglia, at pp. 815–16, 835–49, 870, & 890.

The same witness testified that (1) 62–year-old Virginia Rodriguez was stabbed a total of 27 times, primarily in the chest and upper back, (2) 5 of her 6 chest wounds were potentially fatal, as were 3 of the stab wounds to her upper back because they either penetrated into the heart muscle or lung or cut the pulmonary artery, (3) a wound to her abdomen penetrated her liver and was also potentially fatal, (4) she suffered what appeared to be defensive wounds to her arms, (5) her death was not likely instantaneous, (6) at least some of her wounds appeared to have been caused by an object other than a blade or a phillips=head screwdriver, and (7) she also bled to death as a result of multiple stab wounds. *Id.,* at pp. 816–18 & 850–67.

Ninety-year-old Paula "Lupita" Moran's autopsy revealed that (1) she had suffered 8 stab wounds, 3 of which were potentially fatal because they either cut the pulmonary artery or penetrated her lung, (2) one, non-fatal, stab wound was delivered with sufficient force to penetrate her sternum and was likely caused by an object other than a knife, (3) she suffered a potentially fatal stab wound to her lower back, which penetrated between the ninth and tenth ribs, through her lung, and into her spleen, (4) she also suffered a number of scrapes, lacerations, and bruises to her head and face, including blunt trauma which broke the bones in her nose and cut her lip, and (5) she also suffered a non-fatal stab wound to the back of her left hand and an incised wound to her wrist. *Id.,* at pp. 819–20 & 870–76.

**3.** During petitioner's trial, jurors viewed a videotape recording of the crime scene made shortly after the discovery of the victims' bodies which revealed that a lock had been broken off a closet door in the front bedroom and items strewn on the bed and floor in that room. S.F. Trial, Volume XX, testimony of Mark Edward Witherall, at pp. 126–27.

A series of San Antonio Police Officers testified at trial that (1) there was no sign of forced entry at the home but (2) a wallet containing a considerable sum of cash was found under Rodolfo Rodriguez's body and (3) jewelry was found on some of the victims, as well as in a dresser drawer. S.F. Trial, Volume XX, testimony of Jessica Mary Browne, at pp. 112–14; testimony of Mark Edward Witherall, at pp. 133–34; *Id.,* Volume XXI, testimony of Eddie Gonzales, at pp. 176–77 & 188; testimony of Jimmy W. Porter, at pp. 269–70, 273, 299, 319, 322–24, 230, 334–35.

None of the blood, foot prints, or latent finger prints found at the crime scene were ever matched to petitioner or any other identified suspect. *Id.,* Volume XXI, testimony of Eddie Gonzales, at p. 192; testimony of Gustavo DeLeon, at pp. 258; testimony of Richard Contreras, at pp. 360–61, 366–67, 370, & 381.

**4.** S.F. Trial, Volume XXII, testimony of Gerardo De Los Santos, at pp. 404–18.

**5.** *Id.,* at pp. 419–21.

**6.** *Id.,* at p. 426.

orally and in writing, petitioner agreed to be interviewed by law enforcement officers in connection with the murders.[7]

At the conclusion of his interview, petitioner executed a five-page voluntary statement in which he admitted, in pertinent part, that (1) in the weeks prior to the murders, Guadalupe "Lupe" Hernandez, who often furnished petitioner with cocaine, had made several comments to petitioner that he had an uncle in San Antonio who kept a large sum of money in a closet and that he (Lupe Hernandez) wanted to "get the money"; (2) on the night in question, he, Lupe Hernandez, and Lupe's brother, Jesse Hernandez, left Carrollton, Texas for San Antonio; (3) petitioner agreed to go along initially because Lupe was furnishing him with cocaine and drove his own vehicle from, Carrollton to Waco, at which point, Lupe took over driving; (4) Lupe parked the car along the curb at his uncle's house and crudely ordered petitioner to get out of the car; (5) Lupe knocked on the door and, when a female voice asked who it was, Lupe responded in Spanish "It's me aunt"; (6) a lady in her nightgown opened the door and let them in; (7) the lady offered them food and then prepared them breakfast; (8) after petitioner ate, Jesse called him into a bedroom where Lupe's uncle was sitting on the bed; (9) petitioner sat on the bed next to the uncle and then heard the lady who had cooked them breakfast scream; (10) petitioner looked into the kitchen and saw Lupe stabbing his aunt with some long object that looked like a screwdriver; (11) the lady fell to the floor between the refrigerator and table; (12) when the uncle attempted to get up, petitioner pushed and held him down; (13) Jesse then handed petitioner a screwdriver and petitioner stabbed the man "a lot of times"; (14) after petitioner stopped stabbing him, the man was the bed face down; (15) Lupe told petitioner to "move"; (16) petitioner went into the kitchen and observed the aunt laying between the kitchen and another room while Jesse entered the living room; (17) petitioner then heard a loud "pop" come from the living room; (18) petitioner then observed an old lady in a nightgown in the living room with her head propped against a wall; (19) petitioner stood in the doorway and observed as Jesse pried open a closet door with his hands, began ransacking the closet, and repeatedly yelled profanities; (20) petitioner told Jesse "let's go" and ran past the old lady in the living room, who moved; (21) petitioner then saw Jesse stab the old woman a lot of times; (22) when petitioner approached Jesse, he was cut on the hand; (23) petitioner then observed Lupe exit the bedroom where petitioner had stabbed the old man; (24) Lupe was carrying a colored purse and screwdriver; (25) during their drive to San Antonio, Lupe directed the others to put socks on their hands so as to avoid leaving fingerprints; (26) Lupe then drove then back to Carrollton while petitioner threw up and continued to use cocaine; (27) when they arrived back in Carrollton, they divided up the money and jewelry they had obtained; (28) petitioner received about a hundred dollars cash and a gold nugget ring containing a coin which bore the image of a deer on top and a gold chain with a crucifix; (29) months later, petitioner gave the gold nugget ring to a friend named Andy Nunez; (30) petitioner gave the gold chain to Andy's stepson; and (31) a few days after the murders, petition-

7. S.F. Trial, Volume XXII, testimony of Gerardo De Los Santos, at pp. 428–47; testimony of Joe Flores, at pp. 575–78. A City of Carrollton Police Investigator testified that, at all times throughout his interview, petitioner appeared to be sober, was coherent, and never indicated that he did not understand what was going on. *Id.*, testimony of Joe Flores, at pp. 577–78.

er asked Lupe for money and Lupe gave petitioner several pieces of jewelry which petitioner pawned.[8]

### 4. *Recovery of the Ring*

Law enforcement officer later obtained a gold nugget-Kruggerand ring from Andy Nunez, which was admitted into evidence at trial as State Exhibit no. 81 and identified by members of the victims' family as belonging to Rodolfo Rodriguez.[9] Nunez advised law enforcement officers that petitioner had given him the ring in question.[10]

### B. *Indictment*

On January 26, 1995, a Bexar County grand jury indicted petitioner in cause no. 95–CR–0425B in a one-Count, three-paragraph, indictment charging petitioner with having (1) intentionally and knowingly caused the deaths of both Rodolfo Rodriguez and Paula Moran during the same criminal transaction by cutting and stabbing them with a knife, screwdriver, or a weapon unknown, (2) intentionally and knowingly caused the deaths of both Rodolfo Rodriguez and Victoria Rodriguez during the same criminal transaction by cutting and stabbing them with a knife, screwdriver, or a weapon unknown, and (3) intentionally and knowingly caused the death of Rodolfo Rodriguez while in the course of committing and attempting to commit the robbery of Rodolfo Rodriguez by cutting and stabbing him with a knife, screwdriver, or a weapon unknown.[11]

---

8. Several copies of petitioner's highly inculpatory written statement appears in the record from petitioner's state trial and post-conviction proceedings. One copy appears in Volume II of the transcript of pleadings. Documents, and other motions filed in petitioner's trial court proceeding (henceforth "Trial Transcript"), at pp. 458–62. Another copy was admitted into evidence during petitioner's trial as State Exhibit no. 83 and appears at S.F. Trial, Volume XXVIII, at pp. 1674–78. Yet another copy of petitioner's written statement was admitted into evidence during a pretrial hearing and appears at S.F. Trial, Volume XXVIII, at pp. 1581–85. Furthermore, after its admission a trial, petitioner's statement was read into the record. S.F. Trial, Volume XXII, testimony of Gerardo Del Los Santos, at pp. 460–68.

The Texas Ranger and City of Carrollton Police Investigator who obtained petitioner's statement both testified at trial that petitioner gave his statement in a wholly voluntary and knowing manner, free from any coercion or threats. S.F. Trial, Volume XXII, testimony of Gerardo De Los Santos, at pp. 430–70 & 532; testimony of Joe Flores, at pp. 575–89, 615–17, & 634–38.

9. A Texas Ranger testified that Nunez gave them the ring and later gave a statement indicating that petitioner had given him (Nunez) the ring several months after the murders. S.F. Trial, Volume XXII, testimony of Gerardo De Los Santos, at pp. 472–74; Volume XXIII, testimony of Gerardo De Los San-

tos, at pp. 909–13. Two relatives of Rodolfo Rodriguez identified the ring (State Exhibit no. 81) as the property of their late father. S.F. Trial, Volume XXIII, testimony of Rodolfo Humberto Rodriguez, at p. 751; testimony of Danny Christopher Martinez. Jr., at pp. 755.

At trial, Andy Nunez admitted that he had given law enforcement officers the ring he had obtained from petitioner, i.,e., State Exhibit no. 81, and that the signature on a written statement dated March 4, 1994 was his but denied any independent recollection of having given that statement to law enforcement officers. S.F. Trial, Volume XXIII, testimony of Andy Nunez, at pp. 701–43. Nunez also denied any independent recollection of petitioner ever having told him that petitioner had killed someone to obtain that ring. *Id.*, at pp. 717–19 & 742. The state trial court permitted the prosecution to read Nunez's written statement dated March 4, 1994 (identified at trial as State Exhibit no. 90) into evidence. *Id.*, at pp. 735–37. However, for unknown reasons, no copy of State Exhibit 90 appears in the exhibit volume from petitioner's trial.

10. S.F. Trial, Volume XXII, testimony of Gerardo De Los Santos, at pp. 472–74; Volume XXIII, testimony of Andy Nunez, at pp. 711 & 735–37; Volume XXIII, testimony of Gerardo De Los Santos, at pp. 909–13.

11. Trial Transcript, Volume I, at pp. 5–6

## C. *Guilt–Innocence Phase of Trial*

The guilt-innocence phase of petitioner's trial commenced on March 20, 1995. After the prosecution presented the evidence outlined above, petitioner called only one witness, who testified to having seen two men whom he could not identify in a gray-primer pickup truck stop at, and enter, the Rodriguez residence shortly before midnight the night of the murders and then hurriedly leave the neighborhood about fifteen-to-twenty minutes later.[12] On March 27, 1995, after deliberating less than four hours, the jury returned its verdict, finding the petitioner guilty of capital murder.[13]

## D. *Punishment Phase of Trial*

The punishment phase of petitioner's capital murder trial commenced on March 28, 1995.

### 1. *Prosecution's Evidence*

The prosecution presented several witnesses who testified that petitioner had been involved with several other persons in a theft of more than $670,000 worth of laptop computers from the warehouse of his employer in January, 1994.[14] A classi-

---

**12.** S.F. Trial, Volume XXIV, testimony of Johnny Sandoval, at pp. 941–54.

**13.** Trial Transcript, Volume III, at pp. 477–90; S.F. Trial, Volume XXIV, at p. 1058.

**14.** More specifically, an employee of Future Now, a computer, business equipment, and software retailer, testified that (1) petitioner, a warehouseman, began working for the company on January 4, 1994, (2) on or about January 10, 1994, the company received 163 laptop computers from a supplier, (3) petitioner and another employee named Andy Nunez initialed a document dated January 13, 1994 indicating that they had counted all the laptops received in that shipment, (4) petitioner, Andy Nunez, and a third employee, a warehouse supervisor named Troy Bullard, all quit their jobs without warning on January 24, 1994, (5) the following date, she inspected the company's warehouse but was unable to locate the laptop computers in question, (6) on February 10, 1994, an inventory of the company's multiple storage facilities revealed the laptops were missing, and (7) the missing laptops were valued at $676,000. S.F. Trial, Volume XXV, testimony of Penny J. Gustafson, at pp. 1090–1125.

A City of Carrollton Arson Investigator testified that (1) his investigation into an arson at Future Now storage warehouse that occurred on October 24, 1994 led him to conduct a search of a warehouse owned by a Mark Jordan, (2) evidence obtained during the search of Jordan's warehouse led to the issuance of arrest warrants for a group of fifteen individuals allegedly involved in a complex scheme to steal and sell computers and other products from warehouses in the area, (3) one of the criminal enterprises undertaken by this group was a theft of computers from a Future Now warehouse on or about January 21, 1994, (4) the computers stolen on January 21, 1994 were valued in excess of two hundred thousand dollars, and (5) petitioner had been indicted on a charge of engaging in organized criminal activity in connection with the theft. S.F. Trial, Volume XXV, testimony of David Mark Howell, at pp. 1127–57.

Mark Jordan testified that (1) he was then-currently charged with four-to-five offenses in state and federal court, including theft, attempted theft, and engaging in organized criminal activity, (2) an employee of his company introduced him to a Frank Rangel, (3) he came to understand that Rangel was offering stolen goods for sale, (4) Rangel introduced him to petitioner, Andy Nunez, and Troy Bullard, at a Future Now warehouse in January, 1994, (5) he arranged to have one of his trucks pick up stolen computers from a Future Now warehouse, (6) petitioner represented that he and Nunez would load Jordan's truck and would give Jordan's driver the paperwork necessary, (7) the pickup occurred a few days later and Jordan sold the computers to a company in New Jersey, (8) he met with petitioner, Nunez, and Rangel on several occasions over two-to-three weeks thereafter and conveyed sums to each totaling approximately $13–15,000 each to petitioner and Nunez, while Rangel received approximately $145–150,000, (9) his (Jordan's) cut from the sale of the stolen computers was approximate $75,000, (10) he never saw petitioner after that, (11) petitioner had nothing to do with the October, 1994 arson, (12) Jordan was "looking at" from thirty-to-ninety-

fication officer from the Bexar County Adult Detention Center ("BCADC") testified that (1) petitioner had incurred ten disciplinary infractions during petitioner's period of pretrial detention at that facility, from March, 1994 until March, 1995, (2) petitioner's disciplinary infractions included multiple instances of possession of contraband (a torn tee shirt sleeve and food), multiple instances of refusing to obey oral orders (going upstairs when directed not to do so, conversing with others on the opposite side of the POD) and multiple instances of failing to comply with posted rules (repeatedly placing items over the light fixture in his cell, engaging in loud or boisterous behavior, entering the day room in only his under garments), (3) none of petitioner's disciplinary infractions involved violent conduct or threats of violence and all were considered minor infractions, (4) upon his admission to the BCADC, petitioner admitted to weekly cocaine use but declined to participate in a substance abuse program, (5) petitioner denied any gang affiliation, (6) the only reason petitioner was listed as a "high security" inmate was the charge against him, (7) petitioner had agreed to most of the disciplinary sanctions imposed upon him for his disciplinary infractions, and (8) petitioner had not engaged in any assaultive behavior during detention.[15]

However, a BCADC guard did testify about an incident on January 7, 1995 in which (1) the guard entered petitioner's cell to remove contraband, i.e., milk cartons and oranges, (2) petitioner confronted the guard as he was attempting to exit petitioner's cell and seized one of the oranges from the guard's hand, (3) petitioner then went into the day room and ate the orange, declaring to other inmates and the guard that no disciplinary case would be brought against him without the orange as evidence, and (4) the guard felt threatened by petitioner's confrontational conduct and did not directly challenge petitioner's behavior at the time petitioner seized the orange from him because he deemed it unsafe to do so under the circumstances.[16]

A trio of City of Carrollton law enforcement officer testified about an incident on August 20, 1990 in which (1) petitioner and other persons were observed riding around very late at night, (2) shortly thereafter, police received a call was received from the same area concerning the burglary of a motor vehicle, (3) petitioner and another person were observed running from the scene of the burglarized vehicle and refused orders from officers to halt, (4) petitioner and the other youth were subsequently found hiding behind a church, (5) following his arrest, petitioner gave police two written statements in which he admitted to having participated in a series of motor vehicle burglaries on that night and a previous night, and (6) petitioner was indicted, plead guilty, and received deferred adjudication probation for those offenses.[17] The state trial court also admitted a certified copy of the judgment in petitioner's prior criminal case.[18]

nine years in prison and hoped that his testimony at petitioner's trial would induce the state and federal courts in Dallas to grant him leniency, but (13) he had no formal agreement with any prosecutor regarding his testimony other than a promise from the Bexar County District Attorney's office to report Jordan's helpful testimony to state and federal prosecutors in Dallas. S.F. Trial, Volume XXV, testimony of Mark D. Jordan, at pp. 1158–99.

**15.** S.F. Trial, Volume XXV, testimony of Mark Thomas Gibson, at pp. 1200–66.

**16.** S.F. Trial. Volume XXV, testimony of Luther Dale Cline, at pp. 1267–88.

**17.** S.F. Trial, Volume XXVI, testimony of Paul Wilford, at pp. 1293–1308; testimony of Michael Ellsworth, at pp. 1308–23; testimony of Johnny Ray McCurley, at pp. 1324–53.

**18.** S.F. Trial, Volume XXVI, at p. 1292.

## 2. Petitioner's Evidence

Petitioner's mother testified that (1) her difficult marriage to petitioner's father ended in divorce in 1986, (2) petitioner was the oldest of four children, (3) petitioner's father physically abused both her and petitioner, (4) petitioner witnessed her being abused by her husband, (5) on several occasions, when petitioner was as young as two years old, his father threw petitioner outside at night and locked the door, (6) petitioner's father also struck petitioner and kicked petitioner when petitioner was five years old, (7) petitioner's father did not push petitioner to attend school but did punish petitioner when he brought home poor grades, (8) before her divorce, her children lived in fear of their father, (9) following her divorce, she received no child support from petitioner's father, (10) beginning when he was fifteen, petitioner often went with her and assisted her doing janitorial work at night, (11) petitioner did not finish high school, (12) on a trip to Juarez, Mexico, petitioner wept when he saw people begging for food money, (13) petitioner wept when a neighbor poisoned an injured bird petitioner had nursed back to health, (14) petitioner often took care of his younger siblings when she was working, (15) petitioner is married and has a baby boy, age one year, four months, (16) petitioner's father would not allow the family to celebrate Christmas during their marriage, (17) petitioner was very friendly and had many friends, and (18) after dropping out of school, petitioner worked off and on.[19]

Petitioner's sister testified that (1) she was 18 years old and had borne Jesse Hernandez a daughter even though they had never married, (2) petitioner often took care of his younger siblings and also helped their mother care for an elderly neighbor, (3) petitioner sometimes went downstairs to protect a married neighbor from assaults by her abusive husband, (4) their father was mean to petitioner, often hitting petitioner with his hand or a belt or belt buckle, (5) when they were children, their father once locked both her and petitioner in the unlit basement all night because they would not be quiet and go to sleep, (6) on another occasion, their father locked petitioner outside at night, (7) she and petitioner prepared food for their younger siblings, (8) petitioner supervised the other children in their family, (9) she and petitioner were the closest of friends until petitioner married and moved out, (10) petitioner had never fought anyone, (11) prior to their parents' divorce, when their father assaulted petitioner, their mother would attempt to intervene but their father would push her aside and continue assaulting petitioner, (12) petitioner never told her what happened in San Antonio on the night of the murders, and (13) she was unaware that petitioner had ever ingested cocaine.[20]

Petitioner's aunt testified that (1) she frequently saw petitioner while he was growing up in New Mexico and Hereford, Texas, (2) petitioner and his siblings were very close, (3) prior to his parents' divorce, petitioner and his siblings could not celebrate Christmas, (4) following their parents' divorce, petitioner became a role model for his younger siblings, (5) she was unaware that petitioner had been indicted and convicted for burglary of a motor vehicle at age 17, (6) she did not know petitioner used cocaine, (7) she was unaware that petitioner was then under indictment in connection with the theft of over $200,000 in computers, and (8) petitioner's conviction for capital murder did not change her opinion of his character.[21]

Petitioner's 15–year–old brother testified that (1) he was close to petitioner, (2)

**19.** S.F. Trial, Volume XXVI, testimony of Juana Gonzales Prieto, at pp. 1354–89.

**20.** *Id.,* testimony of Lydia Prieto, at pp. 1390–1418.

**21.** *Id.,* testimony of Gloria Rodriguez, at pp. 1419–29.

petitioner had many friends, (3) petitioner had encouraged him to stay away from gangs and drugs, (4) petitioner supervised him when their mother was away and was never violent toward him, and (5) he was unaware that petitioner had done drugs.[22]

### 3. *The Verdict*

After deliberating for more than twelve hours, and sending out several notes indicating the jurors were deadlocked, during the early morning hours of March 30, 1995, petitioner's jury returned its verdict at the punishment phase of trial, finding (1) beyond a reasonable doubt that there was a probability petitioner would commit criminal acts of violence that would constitute a continuing threat to society, (2) beyond a reasonable doubt that petitioner either actually caused the death of the decedents on the occasion in question or, if he did not actually cause their deaths, that he intended to kill the decedents or another, or anticipated that a human life would be taken, and (3) taking into consideration all the evidence, including the circumstances of the offense, the petitioner's character and background, and petitioner's personal moral culpability, there were insufficient mitigating circumstances to warrant a life sentence.[23]

### E. *Motion for New Trial*

On April 27, 1995, petitioner filed a motion for new trial complaining that (1) the trial court had failed to send a copy of petitioner's written statement back into the jury room during the punishment phase deliberations and (2) after retiring to deliberate, the jury received "additional evidence" regarding petitioner's parole eligibility which impacted the outcome at least one juror's deliberations.[24]

On May 23, 1995, the state trial court held an evidentiary hearing on petitioner's motion for new trial, during which three jurors testified regarding the punishment phase deliberations at petitioner's trial. Juror Marjorie Egloff testified that (1) during deliberations, one member of the jury professed to know that good conduct time credits could reduce the length of time the petitioner would have to serve to only 15–to–20 years, (2) until that time, she had been "going for life" but thereafter decided to change her vote, (3) at one point, the vote on the third special issue was nine "yes," two "no," and one undecided, with her being the undecided vote, (4) she had executed an affidavit for the District Attorney's office in which she denied any outside influence had impacted the jury's deliberations but had not discussed the jury's deliberations over parole eligibility with the District Attorney's office before she executed that affidavit, (5) the other juror did not profess to know the law but did say he was familiar with a "similar case," (6) the jury charge at the punishment phase advised the jury that petitioner would not be eligible for parole for at least 40 years, (7) the other juror or jurors who mentioned good conduct time credits did not say that they knew the law as it applied to petitioner, and (8) she had been confused by the jury charge's language which read that a prisoner convicted of capital felony serving a life sentence would not be eligible for release on parole "until actual calendar time a prisoner has served without consideration of good conduct time equals 40 years." [25]

---

22. *Id.,* testimony of Jamie Prieto, at pp. 1430–35.

23. Trial Transcript, Volume III, at pp. 537–40; S.F. Trial, Volume XXVI, at p. 1491.

24. Trial Transcript, Volume III, at pp. 546–49.

25. S.F. Trial, Volume XXIX, testimony of Marjorie Egloff, at pp. 1497–1518.

The foreman of petitioner's jury testified that (1) when their discussions turned to the question of good time credits and parole, he advised the jury they could not discuss it and several other jurors admonished the group that they could not consider parole or good time credits, (2) he re-read the portion of the court's punishment phase jury charge addressing those subjects many times during their deliberations, (3) no juror professed to possess personal knowledge regarding the law but one or more jurors did claim to have a family member who had received good time credit and gotten out in 15–to–20 years, and (4) the jury charge was read and passed freely around the room during their deliberations.[26]

Another juror testified that (1) the jury charge was reviewed many times during the punishment phase deliberations, (2) one juror shared that he had a family member serving a life term who would be out in 12–to–15 years or something, (3) that juror did not profess to know the law but, rather, only observed that he expected his relative serving a life sentence to be out in ten or twelve or fifteen years, (4) other jurors responded by saying "this is not what we are supposed to discuss" and encouraged the jury to re-read the jury charge, but (5) there was nonetheless some confusion among the jury as to the meaning of the phrase "without consideration of good conduct time" near the middle of their deliberations.[27]

The trial court denied petitioner's motion for new trial.[28]

## F. Direct Appeal

Petitioner appealed both his conviction and sentence. In his appellant's brief, filed February 29, 1996, petitioner presented forty-seven points of error complaining about a plethora of alleged violations of his state and federal rights.[29] In an unpub-

---

26. Id., testimony of Gordon Harold Plank, at pp. 1520–29.

27. Id., testimony of Marsha O. Williams, at pp. 1540–54.

28. Trial Transcript, Volume III, at p. 553.
 The Order denying petitioner's motion for new trial states that it was signed May 22, 1995. Given the fact the hearing on that motion took place the following date, that designation is likely a typographical error.

29. Petitioner's points of error on direct appeal complained about (1) the admission of Andy Nunez's written statement, (2) the admission of petitioner's written statement, (3) the refusal of the trial court to instruct the jury regarding the voluntariness of petitioner's statement, (4) the trial court's refusal to permit petitioner to cross-examine prosecution witness De Los Santos regarding the voluntariness of petitioner's statement, (5) the trial court's refusal to voir dire the jury regarding possible bias in relation to Section 2(b) of Article 38.22 of the Texas Code of Criminal Procedure, (6) the trial court's denial of petitioner's motion for new trial, (7) the trial court's denial of the jury's request to have the blow-up of petitioner's statement during punishment phase deliberations, (8) the trial court's failure to send petitioner's statement back to the jury room during the punishment phase deliberations, (9) the trial court's granting of the prosecution's challenge for cause to venire members Elizabeth Grace Smith, (10) the trial court's finding that venire member Ignacio Javier Martinez was disqualified from jury service, (11) the trial court's denial of petitioner's motion for mistrial based on prosecution witness' Flores' violation of the rule, (12) the trial court's finding that petitioner had failed to make a prima facie showing of racial discrimination by the prosecution during jury selection, (13) the trial court's denial of petitioner's request for a Batson hearing, (14) the trial court's instruction to the jury at the guilt-innocence phase of trial regarding voluntary intoxication, (15) the trial court's denial of petitioner's request to introduce petitioner's school records during the guilt-innocence phase of trial, (16) the trial court's denial of petitioner's motion to quash the indictment, (17) the trial court's denial of petitioner's request to force the prosecution to select one theory of the offense to submit to the jury, (18) the trial court allowing the prosecution to amend the indictment, (19) the trial court's denial of petitioner's requested instruction on the bur-

lished opinion issued December 16, 1998, the Texas Court of Criminal Appeals affirmed petitioner's conviction and sentence.[30] Petitioner did not thereafter seek further review of his conviction on direct appeal by filing a certiorari application with the United States Supreme Court.

## G. State Habeas Corpus Proceeding

On October 8, 1999, petitioner filed an application for state habeas corpus relief in which he asserted sixty-six grounds for relief.[31]

The state trial court held an evidentiary hearing in petitioner's state habeas corpus proceeding on May 31 and June 9, 2000. During that hearing, petitioner's former second chair co-counsel at trial testified that (1) she had urged petitioner to accept a plea bargain offered by the prosecution under which petitioner would have received a pair of thirty-year terms in exchange for petitioner's testimony against Guadalupe Hernandez but, after vacillating, petitioner declined the plea offer, (2) she and petitioner's lead trial counsel con-

---

den of proof on the *Penry* special issue, (20) the alleged insufficiency of the evidence supporting the jury's verdict at both phases of trial, (21) the trial court allowing the prosecution to voir dire the jury venire using an erroneous example of "criminal acts of violence," (22) the lack of meaningful appellate review of the jury's answer to the *Penry* special issue, (23) the absence of proportionality review of capital sentences, (24) the constitutionality of the second capital sentencing special issue, (25) the statutory definition of "mitigating evidence," (26) the absence of a burden of proof on the *Penry* special issue, (27) the constitutionality of the *Penry* special issue, (28) the failure of the trial court to instruct the jury regarding the effect of a single hold-out juror at the punishment phase, (29) the constitutionality of the Texas death penalty, and (30) alleged racial discrimination in the administration of the death penalty in Texas.

**30.** *Prieto v. State*, No. 72,133 (Tex.Crim.App. December 16, 1998).

**31.** Transcript of pleadings, motions, and other documents filed in petitioner's state habeas corpus proceeding (henceforth "State Habeas Transcript"), at pp. 1–145.

In addition to re-urging virtually all of the points of error petitioner had included in his voluminous appellant's brief on direct appeal, petitioner's state habeas corpus application complained that (1) the jury's discussion of parole eligibility during its punishment phase deliberations violated various provisions of the Texas and United States Constitutions, (2) petitioner's trial counsel rendered ineffective assistance by failing to (a) ensure that petitioner's confession was sent back to the jury room when the jury retired to deliberate at

the punishment phase of trial, (b) obtain expert assistance and present mitigating evidence showing petitioner's long-term drug addiction and the effects of same on petitioner, (c) offer petitioner's school records at the punishment phase of trial, and (d) object to the prosecutor's comments on petitioner's lack of remorse, which were comments on petitioner's failure to testify, (3) petitioner's appellate counsel rendered ineffective assistance by failing to (a) raise a *Witherspoon* point of error on direct appeal complaining about the trial court's exclusion of venire member Elizabeth Grace Smith, (b) raise *Witherspoon* and *Garrett* points of error on direct appeal challenging the trial court's exclusion of venire member Ignacio Javier Martinez, and (c) raise an ineffective counsel point of error attacking petitioner's trial counsel's failure to object to the prosecution's comment on petitioner's failure to testify, (4) the trial court erred when it refused to permit petitioner to take the stand for the limited purpose of expressing remorse without facing cross-examination on other subjects, (5) the trial court erred when it failed to accept one of the jury's notes regarding its deadlock at the punishment phase of trial as a verdict form and impose a life sentence, (6) Article 11.071 of the Texas Code of Criminal Procedure violates numerous provisions of the Texas Constitution, (7) the trial court erred in failing to define various terms in the punishment phase jury instructions, and (8) the prosecution violated the rule in *Brady* by failing to disclose to petitioner's trial counsel a report dated May 13, 1994 indicating that petitioner had been "cleared" in connection with the January, 1994 theft of laptop computers in Carrollton.

sulted with a neuropsychologist (Dr. Eubanks) who evaluated petitioner but chose not to call that expert to testify at petitioner's trial for reasons she could not recall, (3) she and petitioner's lead trial counsel consulted with an expert on future dangerousness (Dr. Dickerson) but chose not to call that expert to testify at petitioner's trial because to do so would have opened the door to rebuttal testimony from the prosecution's toxicologist, (4) she and petitioner's lead trial counsel also consulted with a pharmacologist (Dr. Blum) regarding the effects of cocaine ingestion and addiction but chose not to call that expert to testify, either, (5) she learned only after trial that the jury had not had petitioner's confession with them during their punishment phase deliberations, (6) petitioner did not have a violent past but did admit to drug abuse in his written statement, which was corroborated by the physical evidence at the crime scene, (7) the principal trial strategy for the guilt-innocence phase of trial was to seek to exclude petitioner's confession and, failing that, the fall-back strategy was to emphasize petitioner's drug use on the night of the murders, (8) she never had any problems communicating with petitioner and there was never any issue regarding petitioner's competence to stand trial, (9) the testimony at trial established that petitioner had been indicted in connection with the theft of laptop computers in Carrollton, (10) at the punishment phase of trial, she and petitioner's lead trial counsel elicited testimony from petitioner's family members showing that petitioner's father had abused petitioner, petitioner had not graduated from high school but, instead, had dropped out to help his family financially, and (11) she and petitioner's lead trial counsel simply "forgot" to re-offer petitioner's school records at the punishment phase of trial.[32] Neither party called petitioner's lead trial counsel, attorney Michael Bernard, to testify at petitioner's state habeas corpus hearing.[33]

Petitioner's mother testified, in much the same manner as she had at trial, that (1) she had divorced petitioner's father in 1986, (2) petitioner's father was a strict disciplinarian who often kicked and beat petitioner violently, especially when the children made noise, (3) petitioner tried to stop his father's assaults upon his mother, (4) as a child, petitioner once ran into the bumper of a car and was knocked unconscious but, for financial reasons, his father would not allow petitioner to be taken to the hospital, (5) on another occasion, however, petitioner was run over by a car and spent a night in the hospital, after which petitioner suffered memory loss for about two weeks, (6) petitioner was a good student who made poor grades because he often helped her at her work at night, (7) she was unaware of petitioner's drug use and noticed no chance in his emotional state after petitioner allegedly began using drugs, (8) she was unaware that petitioner had turned down a plea bargain offer, and (9) while petitioner had never admitted to her that he had killed anyone, he had

**32.** Statement of Facts from petitioner's state habeas corpus hearing (henceforth "S.F. State Habeas Hearing"), Volume 1 of 3, testimony of Julie Pollock, at pp. 4–45.

**33.** By the date of petitioner's state habeas corpus hearing, attorney Bernard was serving as First Assistant to the Bexar County Criminal District Attorney. Neither party has offered this Court any explanation for the failure of petitioner or the State to call attorney Bernard to testify during petitioner's state habeas corpus proceeding concerning either the information known to petitioner's defense counsel at the time of trial regarding available mitigating evidence or the reasons why petitioner's trial counsel chose not to introduce mitigating evidence of the type petitioner now claims his trial counsel should have presented during the punishment phase of petitioner's trial.

expressed remorse to her through his tears on one occasion.[34]

Petitioner's sister testified, again in much the same manner as she had at trial, that (1) her daughter by Jesse Hernandez was then six years old, (2) Jesse Hernandez had received a life sentence for his role in the murders and she no longer had any contact with him, (3) she still had some contact with the Hernandez family and was worried what Guadalupe Hernandez, who remained free, would do when he learned she was testifying for her brother, (4) she once asked Guadalupe Hernandez what had happened the night of the murders but he became upset and refused to tell her, (5) she was unaware the petitioner had turned down a plea bargain, (6) their father had been abusive toward petitioner. beating him with a belt, (7) she had never seen petitioner use cocaine but knew Guadalupe Hernandez used cocaine daily, (8) she was unaware that petitioner has confessed to his wife that he had killed someone, and (9) petitioner had always denied doing anything.[35]

The former Assistant Bexar County District Attorney who served as lead prosecutor at petitioner's trial testified that (1) Jesse Hernandez was certified as an adult and received a life sentence for his role in the murders, (2) she attempted to negotiate a plea bargain with petitioner, (3) at one point, she believed petitioner had agreed to a plea offer under which petitioner would have received a life sentence but petitioner then recanted his confession and claimed that he had not stabbed anyone on the night of the murders, (4) petitioner had told his wife that he had killed someone, (5) the prosecution maintained an open file policy in petitioner's case, (6)

despite that fact, she would not have disclosed the May 13, 1994 report indicating petitioner had been "cleared" in connection with the computer theft in Carrollton because she considered that memorandum to be work product and, by January, 1995, that report was factually inaccurate, as petitioner had been indicted for his role in that offense, (7) petitioner's indictment in Dallas was made known to petitioner's trial counsel, (8) evidence of a defendant's drug use is double-edged in nature, (9) she did not believe that petitioner's auditory learning difficulties were relevant to any issue during his trial, (10) the pending charge against Guadalupe Hernandez was dismissed after she left the Bexar County District Attorney's office, and (11) she could have called a psychiatric expert to testify at petitioner's trial even if that expert had not personally examined petitioner.[36]

Petitioner called a board-certified child psychiatrist who testified that (1) he had evaluated petitioner and reviewed petitioner's confession, as well as police records regarding the offense, (2) petitioner gave a history of inhalant abuse beginning in middle school, when his grades began to drop, (3) petitioner had also suffered numerous head injuries and a history of physical abuse, (4) the day of the crime, petitioner reported continuous cocaine abuse, (5) petitioner's cocaine abuse, combined with a pre-existing head injury, could cause mild brain impairment contributing to impairment of impulse control and aggressive behavior, (6) cocaine use has been linked to aggressive behavior, as well as depression and irritability, (7) Dr. Eubanks tested petitioner and found no significant memory impairment but did find indications of impairment of executive function-

---

**34.** S.F. State Habeas Hearing, Volume 1 of 3, testimony of Juana "Janie" Prieto, at pp. 45–60.

**35.** *Id.,* testimony of Lydia Prieto, at pp. 61–74.

**36.** S.F. State Habeas Hearing, Volume 1 of 3, testimony of Mary Ellen Smyth, at pp. 76–110.

ing, i.e., the ability to think reflectively and to monitor appearance and behavior in social settings, as well as an affect or mood disorder, (8) petitioner had no history of aggressive behavior as a child or teenager, (9) petitioner's cocaine use could have negatively affected his impulse control and led to excessively aggressive behavior, (10) nonetheless, there was no evidence petitioner suffered from mental retardation, delusions, suicidal or homicidal ideation, or any form of thought disorder, (11) there was no indication petitioner suffered from a major mental illness or defect, (12) the level of petitioner's impulse control at the time of his offense was uncertain, (13) the risk petitioner would engage in aggressive behavior increased once petitioner began ingesting cocaine, (14) petitioner was more vulnerable to peer pressure to engage in aggressive acts when using cocaine, and (15) at the time of his offense, petitioner possessed the cognitive ability to understand the wrongfulness of his conduct but lacked impulse control.[37]

On July 23, 2001, the state trial court issued an Order containing its findings of fact, conclusions of law, and recommendation that petitioner's state habeas corpus application be denied.[38] The Texas Court of Criminal Appeals denied petitioner's state habeas corpus application in an unpublished Order issued November 28, 2001.[39]

## H. *Proceedings in this Court*

On December 13, 2001, petitioner filed a motion requesting that this court appoint counsel to represent him in a federal habeas corpus action challenging his conviction and death sentence.[40] On December 17, 2001, petitioner filed a document styled "exhibits" which included, among other things, a copy of petitioner's state habeas corpus application.[41] On December 27, 2001, this Court appointed counsel to represent petitioner herein and set a deadline of May 3, 2002 for the filing of petitioner's federal habeas corpus petition.[42] On April 16, 2002, petitioner filed a motion requesting that he be granted an extension of time, until September 6, 2002, within which to file his initial federal habeas corpus petition.[43] The following date, this Court granted that requested extension of time.[44] On August 2, 2002, petitioner filed his initial federal habeas corpus petition.[45] On September 24, 2002, petitioner filed an amended federal habeas corpus petition, the operative pleading in this cause.[46] On November 20, 2002, respondent filed a motion to dismiss petitioner's federal habeas corpus petition as untimely and an answer and motion for summary judgment.[47] This Court subsequently permitted the parties considerable time within which to file additional briefs and to supplement the record.[48]

---

**37.** S.F. State Habeas Hearing, Volume 2 of 3, testimony of Randall V. Sellers, at pp. 4–25.

**38.** State Habeas Transcript, at pp. 176–232. The details of the state habeas trial court's factual findings and legal conclusions will be discussed hereinafter in connection with petitioner's claims herein.

**39.** *Ex parte Arnold Prieto,* App. No. 49,954–01 (Tex.Crim.App. November 28, 2001).

**40.** Docket entry no. 1.

**41.** Docket entry no. 2.

**42.** Docket entry no. 3.

**43.** Docket entry no. 5.

**44.** Docket entry no. 6.

**45.** For unknown reasons, this pleading, which received and filed on August 2, 202, was docketed by the Clerk as Docket entry no. 17.

**46.** Docket entry no. 7. Henceforth this pleading will be referred to as petitioner's "Amended Petition."

**47.** Docket entry no. 12.

**48.** Docket entry nos. 14, 16, 22, 24, & 28.

## II. *AEDPA Standard of Review*

Because petitioner filed his federal habeas corpus action after the effective date of the AEDPA, this Court's review of petitioner's claims for federal habeas corpus relief is governed by the AEDPA. *Penry v. Johnson*, 532 U.S. 782, 792, 121 S.Ct. 1910, 1918, 150 L.Ed.2d 9 (2001). Under the AEDPA standard of review, this Court cannot grant petitioner federal habeas corpus relief in this cause in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Williams v. Taylor*, 529 U.S. 362, 404–05, 120 S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000); and 28 U.S.C. § 2254(d).

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of Title 28 U.S.C. Section 2254(d)(1) have independent meanings. *Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002). Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Mitchell v. Esparza*, 540 U.S. 12, 15–16, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003) ("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.' "). A state court's failure to cite governing Supreme Court authority does *not, per se* establish that the state court's decision is "contrary to" clearly established federal law: "the state court need not even be aware of our precedents; 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.' " *Mitchell v. Esparza*, 540 U.S. at 16, 124 S.Ct. at 10.

Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Wiggins v. Smith*, 539 U.S. 510, 520, 123 S.Ct. 2527, 2534–35, 156 L.Ed.2d 471 (2003). A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Wiggins v. Smith*, 539 U.S. at 520–21, 123 S.Ct. at 2535. The focus of this inquiry is on whether the state court's application of clearly established federal law was objectively unreasonable; an "unreasonable" application is different from a merely "incorrect" one. *Wiggins v. Smith*, 539 U.S. at 520, 123 S.Ct. at 2535; *Price v. Vincent*, 538 U.S. 634, 641, 123 S.Ct. 1848, 1853, 155 L.Ed.2d 877 (2003) ("it is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner.") Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions as of the time of the relevant state-court decision establish those principles. *Yarborough v. Alvarado*, 541 U.S. 652, ——, 124 S.Ct. 2140, 2147, 158 L.Ed.2d 938 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.' ");

*Lockyer v. Andrade,* 538 U.S. 63, 71–72, 123 S.Ct. 1166, 1172, 155 L.Ed.2d 144 (2003).

The AEDPA also significantly restricts the scope of federal habeas review of state court fact findings, requiring that a petitioner challenging state court factual findings establish by clear and convincing evidence that the state court's findings were erroneous. *See Morrow v. Dretke,* 367 F.3d 309, 315 (5th Cir.2004), *cert. denied,* —— U.S. ——, 125 S.Ct. 421, 160 L.Ed.2d 325 (2004)("The AEDPA requires that we presume correct the state court's findings of fact unless the petitioner 're-buts the presumption of correctness by clear and convincing evidence.' "); *Pondex-ter v. Dretke,* 346 F.3d 142, 146 & 149 (5th Cir.2003), *cert. denied,* 541 U.S. 1045, 124 S.Ct. 2160, 158 L.Ed.2d 736 (2004)(holding that, pursuant to § 2254(e)(1), state court findings of fact are presumed correct and the petitioner has the burden of rebutting that presumption by clear and convincing evidence); *Henderson v. Cockrell,* 333 F.3d 592, 598 (5th Cir.2003), *cert. denied,* 540 U.S. 1163, 124 S.Ct. 1170, 157 L.Ed.2d 1208 (2004), (holding the same); 28 U.S.C. § 2254(e)(1).

Finally, in this Circuit, a federal habeas court reviewing a state court's rejection on the merits of a claim for relief pursuant to the AEDPA must focus exclusively on the propriety of the ultimate decision reached by the state court and not evaluate the quality, or lack thereof, of the state court's written opinion supporting its decision. *See Pondexter v. Dretke,* 346 F.3d at 148 (holding that the precise question before a federal habeas court in reviewing a state court's rejection on the merits of an ineffective assistance claim is whether the state court's ultimate conclusion was objectively reasonable); *Anderson v. Johnson,* 338 F.3d 382, 390 (5th Cir.2003)(holding a federal habeas court reviews only a state court's decision and not the opinion ex-plaining that decision); *Neal v. Puckett,* 286 F.3d 230, 246 (5th Cir.2002) (*en banc* ), *cert. denied,* 537 U.S. 1104, 123 S.Ct. 963, 154 L.Ed.2d 772 (2003), (holding that a federal court is authorized by § 2254(d) to review only a state court's decision and not the written opinion explaining that decision).

### III. *Limitations Issue*

Respondent has moved to dismiss petitioner's initial substantive pleading, filed August 2, 2002, as untimely.

#### A. *The AEDPA's Statute of Limitations*

■ The AEDPA imposes a one-year limitations period on the filing of federal habeas corpus petition. *Pace v. DiGu-glielmo,* —— U.S. ——, ——, 125 S.Ct. 1807, 1809, 161 L.Ed.2d 669 (2005); *Emer-son v. Johnson,* 243 F.3d 931, 932 (5th Cir.2001); 28 U.S.C. § 2244(d)(1). Under the AEDPA's one-year limitations provision, a convicted criminal defendant must file a Section 2254 petition within one year of the date his conviction becomes final generally or within one year of the AED-PA's effective date, i.e., April 24, 1996, if the defendant's conviction became final prior to that date. *Emerson v. Johnson,* 243 F.3d at 932; *Ybanez v. Johnson,* 204 F.3d 645, 646 (5th Cir.2000), *cert. denied,* 531 U.S. 881, 121 S.Ct. 193, 148 L.Ed.2d 134 (2000); *Felder v. Johnson,* 204 F.3d 168, 169 (5th Cir.2000), *cert. denied,* 531 U.S. 1035, 121 S.Ct. 622, 148 L.Ed.2d 532 (2000); *Coleman v. Johnson,* 184 F.3d 398, 401 (5th Cir.1999), *cert. denied,* 529 U.S. 1057, 120 S.Ct. 1564, 146 L.Ed.2d 467 (2000); *Turner v. Johnson,* 177 F.3d 390, 391 (5th Cir.1999), *cert. denied,* 528 U.S. 1007, 120 S.Ct. 504, 145 L.Ed.2d 389 (1999); *Fisher v. Johnson,* 174 F.3d 710, 712 (5th Cir.1999), *cert. denied,* 531 U.S. 1164, 121 S.Ct. 1124, 148 L.Ed.2d 991 (2001); and *Flanagan v. Johnson,* 154 F.3d 196, 199–201 (5th Cir.1998). The

AEDPA's one-year limitations period serves the well-recognized interest in the finality of state court judgments by restricting the time a prospective federal habeas petitioner has in which to seek federal habeas review. *See Rhines v. Weber*, — U.S. —, 125 S.Ct. 1528, 1534–35, 161 L.Ed.2d 440 (2005) (recognizing that stay and abeyance is available in some cases as a means of avoiding the harsh impact of the total exhaustion requirement combined with the absence of any statutory tolling of the AEDPA's limitations period arising from the filing of a federal habeas petition that is subsequently dismissed for lack of exhaustion); *Woodford v. Garceau*, 538 U.S. 202, 206, 123 S.Ct. 1398, 1401, 155 L.Ed.2d 363 (2003)("Congress enacted the AEDPA to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases, and 'to further the principles of comity, finality, and federalism.' ").

B. *Finality of Petitioner's Conviction and Sentence*

■ The Texas Court of Criminal Appeals affirmed petitioner's conviction and sentence on December 16, 1998. Petitioner's conviction became final for purposes of the AEDPA's one-year statute of limitations not later than March 17, 1999, i.e., the ninety-first day after the date the Texas Court of Criminal Appeals affirmed petitioner's conviction and sentence and the date the deadline for the filing of a certiorari petition with the United States Supreme Court expired. *See Foreman v. Dretke*, 383 F.3d 336, 340 (5th Cir.2004)(holding a Texas prisoner's conviction became final for AEDPA purposes 90 days after the Texas Court of Criminal Appeals denied petition for discretionary review where prisoner did not thereafter file a petition for certiorari with the United States Supreme Court); *Roberts v. Cockrell*, 319 F.3d 690, 694 (5th Cir.2003)(holding that a conviction becomes final at the conclusion of direct review, i.e., when either (1) the United States Supreme Court rejects a certiorari petition or rules on the merits or (2) time for seeking such review expires); 28 U.S.C. § 2244(d)(1)(A).

C. *Statutory Tolling*

■ The AEDPA and the opinions construing same recognize two sources of authority for tolling the one-year statute of limitations. The first is found in the terms of the statute itself. More specifically, the AEDPA provides that its limitations period is tolled while a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending. *Pace v. DiGuglielmo*, — U.S. at —, 125 S.Ct. at 1809; 28 U.S.C. § 2244(d)(2). Petitioner filed his application for state habeas corpus relief on October 8, 1999, 215 days after the AEDPA's 365–day statute of limitation commenced to run. The Texas Court of Criminal Appeals denied petitioner's state habeas corpus application on November 28, 2001. The statutory tolling of the AEDPA's limitations period terminated the following date, when only 150 days of the AEDPA's 365–day limitations period remained unexpired. Petitioner nonetheless filed his initial federal habeas corpus petition in this Court on August 2, 2002, some 248 days after the statutory tolling of the AEDPA's one-year limitations period ended and 98 days after the AEDPA's statute of limitations expired. Thus, even with full benefit of the AEDPA's statutory tolling provision, petitioner's federal habeas corpus petition was untimely.

D. *Equitable Tolling*

■ Both the Supreme Court and Fifth Circuit have recognized, however, that the doctrine of equitable tolling applies to the AEDPA's statute of limitations. *See Pace v. DiGuglielmo*, — U.S. at —, 125 S.Ct. at 1814 (holding a federal habeas petitioner seeking equitable tolling bears the bur-

den of establishing both (1) that he has been pursuing his rights diligently and (2) that some extraordinary circumstances stood in his way); *Larry v. Dretke*, 361 F.3d 890, 896–97 (5th Cir.2004), *cert. denied*, —— U.S. ——, 125 S.Ct. 141, 160 L.Ed.2d 157 (2004), (recognizing the doctrine of equitable tolling preserves a petitioner's claims when strict application of the AEDPA's statute of limitations would be inequitable but that this doctrine applies only in "rare and exceptional circumstances" which do *not* exist absent a showing the petitioner exercised diligence in his pursuit of his rights); *Salinas v. Dretke*, 354 F.3d 425, 431 (5th Cir.2004), *cert. denied*, 541 U.S. 1032, 124 S.Ct. 2099, 158 L.Ed.2d 714 (2004), (holding the AEDPA's statute of limitations may be equitably tolled in "rare and exceptional circumstances"); *Cousin v. Lensing*, 310 F.3d 843, 848–49 (5th Cir.2002), *cert. denied*, 539 U.S. 918, 123 S.Ct. 2277, 156 L.Ed.2d 136 (2003), (holding equitable tolling is available to federal habeas petitioners seeking relief from the AEDPA's statute of limitations but only in "rare and exceptional circumstances," such as where the petitioner has been actively misled by an opposing party or a court and rejecting the argument that neglect or error by the petitioner's own attorney may warrant equitable tolling); *Alexander v. Cockrell*, 294 F.3d 626, 629 (5th Cir.2002), (holding the petitioner bears the burden of proof concerning equitable tolling and that the doctrine does not apply when the petitioner failed to diligently pursue federal habeas corpus relief); *Lookingbill v. Cockrell*, 293 F.3d 256, 263–64 (5th Cir.2002), *cert. denied*, 537 U.S. 1116, 123 S.Ct. 878, 154 L.Ed.2d 793 (2003), (recognizing that equitable tolling applies to the AEDPA's limitations period but holding that a garden variety claim of excusable neglect does not support same).

Application of the doctrine of equitable tolling requires a highly fact-intensive inquiry into the diligence exercised by the petitioner, as well as the circumstances which the petitioner claims impeded his efforts to timely file his federal habeas corpus petition. *See Pace v. DiGuglielmo*, —— U.S. at ——, 125 S.Ct. at 1814 (holding the federal habeas petitioner bears the burden of establishing both that he has diligently pursued his rights and that "some extraordinary circumstance" hindered his efforts to do so); *Alexander v. Cockrell*, 294 F.3d at 629 ("Courts must consider the individual facts and circumstances of each case in determining whether equitable tolling is appropriate.").

■ Petitioner presents several arguments in support of his contention that he is entitled to equitable tolling in this case. However, none of the facts petitioner has alleged in support of these arguments support a finding that petitioner exercised diligence in pursuit of his federal habeas remedies. For instance, petitioner points out that, on March 17, 1997, the Texas Court of Criminal Appeals appointed an attorney for the purpose of investigating and filing an application on petitioner's behalf for state habeas corpus relief and directed said counsel to file such an application within 180 days. The attorney in question apparently did absolutely nothing in response to her appointment or the court's directive.[49] Despite the expiration

---

49. Petitioner has presented this Court with an affidavit in which he states that he had never heard of the name of his first state habeas counsel, i.e., attorney Victoria Langham, prior to 2002 and that he never spoke with her, received any correspondence from her, nor had any communication with any person acting on her behalf. Exhibit 6, attached to Petitioner's Motion to Supplement the Record with Documents and Affidavits, filed January 16, 2004, docket entry no. 25 (henceforth "Petitioner's Motion to Supplement the Record").

Former attorney Verna Victoria Langham has furnished an affidavit in which she states

of the deadline for filing a state habeas application on petitioner's behalf, the Texas Court of Criminal Appeals made no effort to investigate the status of petitioner's case until almost two years had passed. Finally, on January 14, 1999, that court appointed a new attorney to prepare and file a state habeas corpus application on petitioner's behalf. Petitioner's state habeas application was filed on October 8, 1999 and petitioner contends that he should not be held responsible for that portion of the AEDPA's limitations period (215 days) which ran from the date his conviction became final, i.e., on March 17, 1999, until that latter date.

■ The initial problem with petitioner's reliance on his first state habeas counsel's apparent neglect during the two years between her appointment and the date the Texas Court of Criminal Appeals appointed a substitute state habeas counsel for petitioner is that it is well-settled in this Circuit that simple attorney neglect ordinarily does not justify application of the equitable tolling doctrine. *See Salinas v. Dretke*, 354 F.3d at 431–32 (holding equitable tolling is warranted only when the petitioner was actively misled by the op-

posing party or otherwise prevented in some extraordinary way from asserting his rights); *Cousin v. Lensing*, 310 F.3d at 849 (mere attorney error or neglect is not an extraordinary circumstance such that equitable tolling is justified); *Lookingbill v. Cockrell*, 293 F.3d at 264 (declining to apply equitable tolling just because petitioner's federal habeas counsel was busy).

The other problem with petitioner's argument is that petitioner has offered no fact-specific allegations showing that he ever exercised any diligence, from the date his conviction became final until the date his state habeas corpus application was filed, to pursue either state or federal habeas relief. In fact, the record now before this Court is bereft of any allegation, much less any evidence, establishing that petitioner has ever personally undertaken any effort to preserve or assert any of his federal constitutional rights from the date his conviction and sentence became final.[50]

Petitioner likewise alleges no facts showing that he ever relied on any representation by any state agency or state court regarding his initial state habeas counsel's appointment in choosing not to proceed *pro se* to litigate his federal claims in

that (1) she closed her law office in the Summer of 1999 after enduring several years of multiple surgeries and aggressive chemotherapy in her battle against cancer, (2) she voluntarily resigned from the State Bar of Texas in 2001, (3) she has no independent recollection of ever having worked on petitioner's behalf, and (4) all her records from her former law practice were destroyed in a flood. Exhibit 2, attached to Petitioner's Motion to Supplement the Record.

Other documents submitted to this Court by petitioner establish that former attorney Langham notified some state agencies and courts of her desire to resign from the practice of law at least as early as July 12, 2000. Exhibit 3, attached to Petitioner's Motion to Supplement the Record.

50. While petitioner asserts that he never even heard the name of his initial state habeas

counsel until 2002, petitioner offers no rational explanation for his failures either to seek state habeas remedies in a timely manner *pro se* or to file a *pro se* motion seeking the appointment of counsel for the purpose of pursuing state or federal habeas corpus relief. Petitioner effectively admits that he did absolutely nothing himself to pursue state or federal habeas remedies once his conviction became final. There is no allegations currently before this Court suggesting that petitioner was ever aware of the fact that former attorney Langham or any other attorney had been appointed to represent him in connection with an anticipated state habeas corpus proceeding. This is not, therefore, a case in which a federal habeas petitioner relied to his detriment on the fact that a state court had appointed counsel to represent petitioner in a pending or anticipated state habeas corpus proceeding.

either state or federal court. Thus, this is not a case in which petitioner claims that he was actively misled by any misrepresentation made by any state agency, state court, or any federal court. Petitioner does not allege that he was unaware of the AEDPA's limitations period or otherwise precluded from timely filing a *pro se* pleading sufficient to preserve his federal claims herein.

Moreover, none of the documents presented to this Court to date establish that petitioner's initial state habeas counsel ever notified any state agency or state court, before or during the time she was appointed to represent petitioner in connection with his state habeas corpus proceeding, that she was then suffering from an incapacitating illness, medical condition, or other impairment. Likewise, there is no fact-specific allegation now before this Court establishing that petitioner's initial state habeas counsel was actually incapacitated by her illness during the time she was appointed to represent petitioner. As respondent correctly points out, the affidavits and other documents submitted to this court by petitioner establish only that petitioner's initial state habeas counsel began battling cancer sometime in April, 1994 and, shortly thereafter underwent a bilateral mastectomy and aggressive chemotherapy. Those documents also establish that, in June, 2000, her stomach was removed due to the spread of her cancer. Nonetheless, petitioner offers this Court no fact-specific allegations, much less any evidence, establishing the status of his initial state habeas counsel's health during the period from March 17, 1997 until January 14, 1999, when she was appointed to represent petitioner. Nor does petitioner allege any facts showing that his initial state habeas counsel ever informed, advised, or notified any responsible state agency or court regarding her medical problems prior to July, 2000.

More significantly, this is not a case in which the neglect of a petitioner's state habeas counsel extended throughout the entire duration of the AEDPA's limitations period. When the Texas Court of Criminal Appeals denied petitioner's state habeas corpus application on November 28, 2001, 150 days of the AEDPA's one-year statute of limitations remained unexpired. Petitioner filed his motion for appointment of counsel in this Court on December 13, 2001. As of the date this Court appointed counsel for petitioner in this cause, i.e., on December 27, 2001, at least 121 days remained unexpired on the AEDPA's limitations period. This Court initially set a deadline of May 3, 2002 for the filing of petitioner's federal habeas corpus petition. Assuming that petitioner is entitled to equitable tolling for the duration of the two-week period his motion for appointment of counsel was pending before this Court, this Court's initial deadline for the filing of petitioner's federal habeas corpus petition was within the applicable AEDPA limitations period. It was petitioner who, on April 16, 2002, chose to seek an extension on his filing deadline until September 6, 2002.[51] Petitioner's federal habeas counsel had sufficient tile to file a federal habeas petition within the limits established by the AEDPA but did not do so.

As of the date he sought to extend his filing deadline, petitioner had several options available to him to preserve his federal claims against a challenge to their timeliness, including the filing of a skeletal petition accompanied by a motion for leave to amend. Petitioner did not avail himself of those options but sought only an extension on the deadline for the filing of his petition, which this Court promptly granted.[52]

---

51. Docket entry no. 5.

52. Docket entry no. 6.

■ Petitioner's stated reason for seeking an extension on this Court's initial filing deadline was that his federal habeas counsel was busy representing other clients. It is clear in this Circuit that a federal habeas counsel's busy schedule does not mandate application of equitable tolling. *See Lookingbill v. Cockrell*, 293 F.3d at 264 ("we decline to apply equitable tolling just because a lawyer is busy"). Petitioner's federal habeas counsel aggressively sought appointment in this and other federal habeas corpus actions pending before this Court and was given ample opportunity to file a federal habeas corpus petition on petitioner's behalf within the AEDPA's limitations period (including more than four months from the date this Court appointed said counsel to represent petitioner herein). Petitioner's federal habeas counsel's "busy schedule" does not warrant application of equitable tolling in this cause.

■ Insofar as petitioner argues that the document petitioner filed in this Court on December 17, 2001 somehow tolled the running of the AEDPA's limitations period, respondent correctly points out that argument is foreclosed by the Supreme Court's holding in *Woodford v. Garceau* that a federal habeas action brought under the AEDPA begins with the filing of a pleading that seeks affirmative relief *on the merits* and not a mere request for appointment of counsel or for stay of execution. *See Woodford v. Garceau*, 538 U.S. at 207–08, 123 S.Ct. at 1402 (holding that a federal habeas action begins with the filing of an application for habeas corpus relief); *Fierro v. Cockrell*, 294 F.3d 674, 680 (5th Cir.2002), *cert. denied*, 538 U.S. 947, 123 S.Ct. 1621, 155 L.Ed.2d 489 (2003), (holding that the filing of a motion for authorization to file a successive petition is not itself an application for a writ of habeas corpus and does not satisfy the AEDPA's one-year statute of limitations); *Williams v. Cain*, 125 F.3d 269, 273–74 (5th Cir.1997), *cert. denied*, 525 U.S. 859, 119 S.Ct. 144, 142 L.Ed.2d 116 (1998), (holding that the filing of motions for stay of execution, appointment of counsel, and to proceed *in forma pauperis* did not constitute the filing of a petition for federal habeas relief under the AEDPA).

Petitioner filed his motion for appointment of counsel in this Court on December 13, 2001.[53] Four days later, petitioner filed a voluminous document which he styled "EXHIBITS" and requested that the Court "attach the following exhibits to the Motion for Appointment of Counsel" he had previously filed.[54] Nothing in either of these two documents indicated that petitioner was therein seeking an affirmative ruling on the merits of any identified or identifiable claim. The happenstance that petitioner included a copy of his state habeas corpus application among the many documents included in the latter submission does not excuse petitioner from his duty to present this Court with an application or petition for federal habeas relief "on the merits" within the AEDPA's limitations period.

Nothing in this Court's subsequent Orders, including this court's Orders granting petitioner's motion for appointment of counsel, could reasonably have misled petitioner regarding his continuing obligation to timely comply with the AEDPA's limitations period. Under such circumstances, the filing of petitioner's motion for appointment of counsel and the exhibits belatedly accompanying same does not entitle petitioner to equitable tolling in this cause.

---

**53.** Docket entry no. 1.

**54.** Docket entry no. 2.

### E. *Conclusion*

Even when petitioner is credited with all the statutory tolling mandated by the AEDPA, his federal habeas corpus petition filed August 2, 2002 was untimely. Equitable tolling does not apply in this cause to excuse petitioner's untimely filing and his federal habeas corpus petition must be dismissed as untimely.[55]

### IV. *Ineffective Assistance Claims*

#### A. *The Claims*

In his first five claims for federal habeas relief, petitioner argues that his trial counsel rendered ineffective assistance during the punishment phase of petitioner's trial by failing to (1) present mitigating evidence, (2) introduce petitioner's school records, (3) present expert testimony regarding petitioner's drug abuse and addiction and the effects of same on petitioner's behavior, (4) ensure that petitioner's written confession was physically sent back to the jury room during its punishment-phase deliberations, or (5) object to the prosecution's comments on petitioner's failure to testify.[56]

#### B. *Clearly Established Federal Law*

The constitutional standard for determining whether a criminal defendant has been denied the effective assistance of *trial* counsel, as guaranteed by the Sixth Amendment, was announced by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First,

the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

To satisfy the first prong of *Strickland,* i.e., establish that his counsel's performance was constitutionally deficient, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith,* 539 U.S. 510, 521, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003); *Williams v. Taylor,* 529 U.S. 362, 390–91, 120 S.Ct. 1495, 1511, 146 L.Ed.2d 389 (2000). In so doing, a convicted defendant must carry the burden of proof and overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance. *Strickland v. Washington,* 466 U.S. at 687–91, 104 S.Ct. at 2064–66. Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight. *See Wiggins v. Smith,* 539 U.S. at 523, 123 S.Ct. at 2536 (holding that the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms which includes a context-dependent consideration of the challenged conduct as seen

---

**55.** As is explained hereinafter, this Court's resolution of the limitations issue in this cause is sufficiently tenuous to justify issuance of a Certificate of Appealability on that issue. Out of an abundance of caution, therefore, this Court will address the merits of petitioner's claims for federal habeas relief herein.

**56.** Petitioner's Amended Initial Application for Writ of Habeas Corpus, filed September 24, 2002, docket entry no. 7 (henceforth "Petition"), at pp. 34–84.

from the perspective of said counsel at the time). It is strongly presumed that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland v. Washington,* 466 U.S. at 690, 104 S.Ct. at 2066.

To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins v. Smith,* 539 U.S. at 534, 123 S.Ct. at 2542; *Strickland v. Washington,* 466 U.S. at 694, 104 S.Ct. at 2068. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Id.* In evaluating prejudice, a federal habeas court must re-weigh the evidence in aggravation against the totality of available mitigating evidence. *Wiggins v. Smith,* 539 U.S. at 534, 123 S.Ct. at 2542.

In evaluating petitioner's complaints about the performance of his counsel under the AEDPA, the issue before this Court is whether the Texas Court of Criminal Appeals could reasonably have concluded that petitioner's complaints about his trial counsel's performance failed to satisfy either prong of the *Strickland* analysis. *Schaetzle v. Cockrell,* 343 F.3d 440, 444 (5th Cir.2003), *cert. denied,* 540 U.S. 1154, 124 S.Ct. 1156, 157 L.Ed.2d 1050 (2004). In making this determination, this Court must consider the underlying *Strickland* standard. *Id.* In those instances in which the state courts failed to adjudicate either prong of the *Strickland* test, this Court's review of the un-adjudicated prong is *de novo.* See *Rompilla v. Beard,* — U.S. ——, ——, 125 S.Ct. 2456, 2467–68, 162 L.Ed.2d 360 (2005) (holding that *de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffec-

tive assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith,* 539 U.S. at 534, 123 S.Ct. at 2542 (holding the same).

C. *Failure to Present Mitigating Evidence*

1. *Clarifying the Issues*

■■■ In neither his state habeas pleadings nor in this Court has petitioner complained that his trial counsel failed to adequately investigate or discover available mitigating evidence. Instead, petitioner's complaints focus exclusively on the failure of his trial counsel to present the jury with potentially mitigating evidence during the punishment phase of trial. Thus, this is not a case, like *Rompilla v. Beard* or *Wiggins v. Smith,* in which there is an allegation that petitioner's trial counsel failed to fulfill their duty to adequately investigate available sources of information regarding the petitioner's background in search of mitigating evidence. Simply put, petitioner presented the state habeas court with no evidence showing that his trial counsel were unaware of the existence of specific mitigating evidence; rather, petitioner's complaint lies solely with the decision of his trial counsel not to present certain mitigating evidence.

2. *State Court Disposition*

The state habeas trial court concluded that petitioner's complaints regarding his trial counsel's failures to either (1) present petitioner's school records, (2) present expert testimony regarding drug use and addiction, (3) ensure petitioner's written confession was sent to the jury room during the punishment phase deliberations, or (4) otherwise present mitigating evidence failed to satisfy either prong of *Strickland.*[57]

---

**57.** State Habeas Transcript, at pp. 181 & 207–08.

### 3. AEDPA Review of Mitigating Evidence Complaints

#### a. No Deficient Performance

The state habeas court reasonably concluded that petitioner's complaints about the failure of his trial counsel to present the mitigating evidence in question failed to satisfy the deficient performance prong of *Strickland*. A convicted defendant must carry the burden of proof and overcome a strong presumption that the conduct of his trial counsel fell within a wide range of reasonable professional assistance. *Strickland v. Washington*, 466 U.S. at 687–91, 104 S.Ct. at 2064–66. Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight. *See Wiggins v. Smith*, 539 U.S. at 523, 123 S.Ct. at 2536 (holding that the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time). It is strongly presumed that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland v. Washington*, 466 U.S. at 690, 104 S.Ct. at 2066.

The Fifth Circuit has consistently recognized that the decision to present or not present mitigating evidence during the punishment phase of a capital trial ordinarily falls within the broad parameters of a trial counsel's strategic or tactical decision-making authority. *See, e.g., Riley v. Cockrell*, 339 F.3d 308, 316–17 (5th Cir. 2003), *cert. denied*, —— U.S. ——, 125 S.Ct. 866, 160 L.Ed.2d 781 (2005), (holding trial counsel were not *per se* deficient in failing to present mitigating evidence); *Hopkins v. Cockrell*, 325 F.3d 579, 586 (5th Cir.2003), *cert. denied*, 540 U.S. 968, 124 S.Ct. 430, 157 L.Ed.2d 314 (2003), (recognizing that the decision to present double-edged mitigating evidence lies within trial counsel's broad tactical or strategic discretion); *Smith v. Cockrell*, 311 F.3d 661, 669 (5th Cir.2002), *cert. dism'd*, 541 U.S. 913, 124 S.Ct. 1652, 158 L.Ed.2d 263 (2004), (holding the failure to investigate, develop, and present mitigating evidence is not ineffective *per se*); *Moore v. Johnson*, 194 F.3d 586, 615 (5th Cir.1999) (holding the failure to present mitigating evidence is not *per se* deficient performance); *Crane v. Johnson*, 178 F.3d 309, 314 (5th Cir. 1999), *cert. denied*, 528 U.S. 947, 120 S.Ct. 369, 145 L.Ed.2d 285 (1999), (holding the same); *Rector v. Johnson*, 120 F.3d 551, 564 (5th Cir.1997), *cert. denied*, 522 U.S. 1120, 118 S.Ct. 1061, 140 L.Ed.2d 122 (1998), (holding the same); *Turner v. Johnson*, 106 F.3d 1178, 1188 (5th Cir. 1997) (holding the failure to present mitigating evidence, if based on an informed and reasoned practical judgment, is well within the range of practical choices not to be second-guessed).

Thus, petitioner bore the burden during his state habeas corpus proceeding of both (1) identifying potentially mitigating evidence which his trial counsel failed to present to the petitioner's sentencing jury and (2) proving that the failure of said counsel to present that mitigating evidence was objectively unreasonable, i.e., caused the performance of said counsel to fall below an objective level of reasonableness. The latter inquiry required an exploration of the tactical or strategic reasons *why* petitioner's trial counsel, admittedly aware of the potentially mitigating evidence in question, chose not to present same to petitioner's sentencing jury. During the evidentiary hearing held in petitioner's state habeas corpus proceeding, however, petitioner never bothered to call petitioner's lead trial counsel, attorney Michael Bernard, to testify.[58] Petitioner's co-counsel at trial, at-

---

**58.** This Court is aware that, by the time of the evidentiary hearing in petitioner's state

torney Julie Pollock, testified that (1) she and Bernard "simply forgot" to re-offer petitioner's school records after attempting to admit them during the punishment phase of trial for the purpose of challenging the voluntariness of petitioner's confession, (2) she and Bernard consulted with a trio of expert witnesses, including a neuro-psychologist, an expert on future dangerousness, and a pharmacologist but they ultimately chose not present any of these three witnesses at petitioner's trial, (3) they chose not to present the expert testimony in question because they feared it might open the door to rebuttal testimony from an expert toxicologist on the prosecution's witness list, and (4) she believed all admitted evidence had been sent back to the jury and learned only after trial that the jury did not have petitioner's written statement during its punishment phase deliberations.[59] Petitioner made very little effort during attorney Pollock's testimony to explore the reasons why petitioner's trial counsel chose not to present expert testimony regarding petitioner's drug addiction and the effects of same on petitioner's behavior.

Significantly, petitioner presented the state habeas court with absolutely no evidence establishing precisely what favorable testimony either Dr. Blum, petitioner's expert pharmacologist, or Dr. Dickerson, petitioner's future dangerousness expert, could have offered had they been called to testify at trial. Thus, petitioner failed to overcome the presumption of reasonableness that accompanied the strategic decision by petitioner's trial counsel not to call either of these two expert witnesses to testify at trial.

Petitioner's trial counsel also consulted with a Dr. Joseph Eubanks, a neuro-psychologist who evaluated petitioner and prepared a written report, but chose not to present his testimony at petitioner's trial. A copy of Dr. Eubanks' report was admitted during petitioner's state habeas corpus hearing as "Defendant's Exhibit 1." [60] That report indicates that petitioner tested within the normal range on most of portions of the examination Dr. Eubanks conducted but there were indications that the petitioner (1) may suffer from a affective disorder or difficulty with executive func-

habeas corpus proceeding, attorney Bernard was serving as first assistant to the Bexar County Criminal District Attorney. However, this fact did not prevent petitioner's state habeas counsel from subpoenaing attorney Bernard to testify at petitioner's state habeas hearing regarding his strategic and tactical reasoning in connection with the punishment phase of petitioner's trial. It is common place in Bexar County for state court judges to give testimony in state habeas corpus proceedings regarding their previous representations of capital murder defendants and attorney Bernard's administrative position did not immunize him from the responsibility to fulfill the same duty had he been called upon to do so. It is almost impossible to carry the burden of proving ineffective assistance by trial counsel without calling *both* of a capital habeas petitioner's trial counsel to testify regarding their strategic or tactical decision-making. Attorney Pollock's testimony regarding the reasons why she and Bernard

chose not to call any of the three experts with whom they had consulted to testify at trial was extremely vague, at best. In such a case, it was incumbent upon petitioner to call attorney Bernard to testify and to interrogate petitioner's former lead trial counsel regarding precisely why neither Dr. Blum, Dr. Dickerson, nor Dr. Eubanks were called to testify at petitioner's trial. The unexplained failure of petitioner's state habeas counsel to do so left the state habeas court with a record practically devoid of any evidence that might have been used to overcome the presumption of objective reasonableness that accompanied that strategic decision.

59. S.F. State Habeas Hearing, Volume 1 of 3, testimony of Julie Pollock, at pp. 11–15, 18–19, 31–34, 38–39, & 42.

60. A copy of Dr. Eubanks' February 20, 1995 report appears in S.F. State Habeas Hearing, Exhibits Volume 3 of 3.

tioning and (2) had demonstrable difficulty with auditory processing, which likely was of life-long duration and possibly contributed to petitioner's academic difficulties. Dr. Sellers, the psychiatrist who evaluated petitioner and testified during petitioner's state habeas corpus hearing (1) agreed with most of Dr. Eubanks' conclusions, (2) explained that petitioner's "affect disorder" or "mood disorder" reduced petitioner's ability to think, reflect, and monitor behavior in social situations, (3) explained that petitioner began abusing inhalants in middle school and this abuse coincided with the beginning of petitioner's academic failures, (4) opined that petitioner's cocaine abuse could help explain, in light of petitioner's lack of a history of aggressive behavior, the petitioner's aggressive behavior on the night of the murders, (5) explained that cocaine use would negatively impact petitioner's ability to control his impulses, (6) testified that, because of petitioner's pre-existing brain injury, excess aggressive and increased impulsive behavior could be expected whenever petitioner abused cocaine, (7) opined that, when petitioner abused cocaine, petitioner was more vulnerable to peer pressure to engage in aggressive behavior, but (8) admitted his evaluation of petitioner found no indication of formal thought disorder, mental retardation, psychotic or delusional behavior, and no major mental illness or defect.[61] At best, then, the evidence petitioner complains his trial counsel failed to present to the jury at the punishment phase of trial contained both potentially mitigating, as well as potentially aggravating aspects. Among the latter were the facts petitioner had a long-term history of inhalant abuse and was addicted to cocaine, two facts conspicuously absent from the trial testimony of any of petitioner's punishment-phase witnesses.

Instead of presenting expert testimony at trial along the lines of that suggested by Dr. Eubanks' report and Dr. Seller's testimony during petitioner's state habeas corpus hearing, petitioner's trial counsel chose to present testimony from petitioner's mother, sister, aunt, and teenage brother. All of these witnesses asserted that, despite a history of childhood abuse at the hands of his violent father, petitioner was not a violent person and possessed many good qualities.[62]

The objective reasonableness of petitioner's trial counsel's decision to focus their punishment-phase presentation on furnishing the jury with evidence of petitioner's good character and redeeming qualities, rather than portraying petitioner as long-term inhalant abuser and a cocaine addict, must be evaluated in the context of the special issues facing the jury during the punishment phase of petitioner's trial. As explained above,[63] the issues before the jury at the punishment phase of petitioner's trial inquired whether petitioner posed a risk of future dangerousness, had acted on the night of the murders with at least anticipation that a human life would be taken, and possessed a background which warranted a life sentence. It is not an oversimplification to state that petitioner's trial counsel were faced with the daunting task of trying to convince the jury to spare petitioner's life despite petitioner's written confession in which he admitted to having repeatedly stabbed an elderly man with a screwdriver at the climax of a lengthy, cocaine-fueled, road trip. Dr. Sellers' testimony during petitioner's state habeas

---

**61.** S.F. State Habeas Hearing, Volume 2 of 3, testimony of Randall V. Sellers, at pp. 5–25.

**62.** *See* Section I.D.2. above, i.e., notes 19–22, *supra,* and accompanying text.

**63.** *See* note 23, *supra,* and accompanying text.

hearing strongly suggested that petitioner's pre-existing brain impairment, which was never definitively identified as deriving from either childhood head injuries or petitioner's long-term inhalant abuse, made petitioner more susceptible than most persons to aggressive behavior and a lack of impulse control when abusing cocaine. Dr. Sellers' testimony also suggested that petitioner's "affect disorder" reduced petitioner's ability to control his own impulsive behavior or to accurately process information in social settings. The potentially negative impact from petitioner's perspective of such expert opinion testimony on the jury with regard to both the first and third capital sentencing special issues is obvious.

Under such circumstances, especially given petitioner's complete failure to interrogate petitioner's lead trial counsel concerning the rationale behind the decision not to present such expert opinion testimony, and the potential impact of rebuttal testimony from the prosecution's toxicologist expert, the state habeas court reasonably could have concluded that petitioner failed to overcome the presumption of reasonableness to which the strategic decision by petitioner's trial counsel was entitled.

Moreover, having independently evaluated the same evidence as the state habeas court, this Court likewise concludes that the decision by petitioner's trial counsel to focus the jury's attention on petitioner's redeeming personal qualities, rather than portraying petitioner as a long-term inhalant abuser and cocaine addict, did not cause the performance of said counsel to fall below an objective level of reasonableness. Petitioner's trial counsel were faced with the difficult task of convincing the jury that, despite petitioner's admissions to cocaine abuse and having fatally stabbed an elderly man to death for a few hundred dollars in cash and jewelry (and to having conspired to help his accomplices

murder their own kin), petitioner was basically a non-violent individual who deserves to be spared the death penalty. Given the evidence that was presented to the jury at the guilt-innocence phase of trial and the extensive evidence showing that petitioner continued to engage in criminal activities after the murders, there was nothing objectively unreasonable with petitioner's trial counsel choosing to portray petitioner in a favorable light at the punishment phase of trial.

In sum, it was objectively reasonable for petitioner's trial counsel to refrain from presenting the jury with double-edged evidence. *See Martinez v. Dretke,* 404 F.3d 878, 889 (5th Cir.2005) (holding trial counsel's decision not to introduce double-edged evidence of petitioner's organic brain injury was reasonable and entitled to deference); *Hopkins v. Cockrell,* 325 F.3d at 586 (holding that a tactical decision not to pursue and present potential mitigating evidence on the ground that it is double-edged in nature is objectively reasonable); *Johnson v. Cockrell,* 306 F.3d 249, 253 (5th Cir.2002), *cert. denied,* 538 U.S. 926, 123 S.Ct. 1573, 155 L.Ed.2d 319 (2003), (holding that, so long as the decision not to introduce double-edged mitigating evidence was based on trial strategy rather than a lack of investigation, those questions are less susceptible to judicial second-guessing); *Foster v. Johnson,* 293 F.3d 766, 780–84 (5th Cir.2002), *cert. denied,* 537 U.S. 1054, 123 S.Ct. 625, 154 L.Ed.2d 532 (2002), (holding objectively reasonable trial counsel's decision not to introduce double-edged evidence regarding petitioner's mental disorders and recognizing that the state court's finding that the psychiatric report in question was double-edged in nature was a factual determination entitled to a presumption of correctness absent clear and convincing proof to the contrary); *Lamb v. Johnson,* 179 F.3d 352, 358 (5th Cir.1999), *cert. denied,* 528

U.S. 1013, 120 S.Ct. 522, 145 L.Ed.2d 401 (1999), (holding reasonable a tactical decision not to pursue or present potentially mitigating evidence on the ground it was double-edged in nature); *Nobles v. Johnson*, 127 F.3d 409, 422–24 (5th Cir.1997), *cert. denied*, 523 U.S. 1139, 118 S.Ct. 1845, 140 L.Ed.2d 1094 (1998), (holding there was nothing objectively unreasonable with trial counsel's failure to present psychological evidence of petitioner's volatile mental state where the trial strategy was to emphasize petitioner's non-violent nature because "mitigation is in the eye of the beholder").

Petitioner's trial counsel pursued an objectively reasonable trial strategy in which they attempted to emphasize petitioner's non-violent nature, the aberrational nature of petitioner's violent assault on Rodolfo Rodriguez, and the petitioner's many redeeming personal qualities. Introducing expert testimony regarding the impact of petitioner's cocaine addiction would also have undermined the credibility, as well as the efficacy, of the trial testimony of petitioner's family members, none of whom possessed any knowledge of petitioner's cocaine use.

The burden was on petitioner to prove to the state habeas court that his trial counsel's decision not to present the potentially mitigating evidence in question was unreasonable under the circumstances. *See Crane v. Johnson*, 178 F.3d at 315 (recognizing that the burden is on the petitioner to overcome the presumption that his trial counsel's strategic decision not to present certain potentially mitigating evidence at the punishment phase of trial was objectively reasonable where the evidence in question possessed a double-edged quality). Petitioner failed to carry that burden of proof. In fact, petitioner made little effort during his state habeas corpus hearing to even explore the strate-gic reasons underlying those decisions by his trial counsel, much less to prove those decisions unreasonable.

The admission by petitioner's co-counsel at trial, attorney Pollock, that she and Bernard simply failed to re-introduce petitioner's school records during the punishment phase of trial does not, standing alone, establish deficient performance under *Strickland*. This Court has independently reviewed the records in question, which were marked at trial as Defendant's Exhibit 3, and finds that they relate exclusively to petitioner's academic performance in high school, subsequent to the time Dr. Sellers testified petitioner began abusing inhalants. Thus, any potentially mitigating value to naked school records showing that petitioner performed poorly in high school would have been more than offset by the potential for such records to emphasize that petitioner's voluntary inhalant abuse beginning in middle school was more likely the cause of petitioner's "pre-existing brain impairment" than any violent abuse petitioner suffered as a child. Thus, even if the failure of petitioner's trial counsel to re-offer petitioner's high school records during the punishment phase of trial was the product of negligence, rather than deliberate trial strategy, viewed from an objective perspective, that failure was nonetheless objectively reasonable because that failure withheld from the jury evidence which (1) possessed very little mitigating value and (2) an aggressive prosecutor might have used to emphasize the negative aspects of petitioner's character, i.e., petitioner's long-term drug and inhalant abuse.

Petitioner's family members presented extensive testimony at trial regarding the emotional and physical abuse petitioner suffered as a child at the hands of his father.[64] During petitioner's state habeas

---

**64.** *See* notes 19–22, *supra*, and accompanying text.

corpus hearing, petitioner's mother and sister offered only a few additional details of that abuse.[65] As was true at petitioner's trial, the thrust of their testimony during petitioner's state habeas corpus hearing was an attempt to establish petitioner's non-violent character. None of petitioner's family would admit, however, to having any personal knowledge regarding petitioner's professed long-term history of inhalant and cocaine abuse.

■■■■ Finally, the state habeas court reasonably concluded that petitioner's trial counsel acted in an objectively reasonable manner in connection with the inadvertent failure of the trial court to send petitioner's written statement to the jury room during the jury's punishment phase deliberations. It is undisputed that petitioner's confession was examined and discussed by the jury during its deliberations at the guilt-innocence phase of trial but that, for unknown reasons, that same trial exhibit was never transmitted to the jury room during the jury's punishment phase deliberations.[66] The jury did send out a note during its punishment-phase deliberations requesting that it be permitted to examine a blowup of petitioner's confession that had been used by the prosecution during its closing argument.[67] However, presumably because that blowup had not been admitted into evidence, that request was denied.[68] At no time during its punishment-phase deliberations did the jury indicate to the trial court that it did not have possession of all the trial exhibits, including petitioner's written confession, that had been properly admitted into evidence. Petitioner identified nothing which oc-

curred before or during the jury's punishment-phase deliberations which would or should have alerted petitioner's trial counsel to the fact that petitioner's confession was not physically present in the jury room during the punishment=phase deliberations. Moreover, given the horrific nature of petitioner's offense detailed in petitioner's written confession, and the fact the jury clearly had examined and discussed that document during its guilt-innocence phase deliberations only days before, petitioner's trial counsel cannot reasonably be faulted for failing to ensure that this key piece of the prosecution's case against petitioner was not present when the jury undertook its punishment-phase deliberations. Under such circumstances, the state habeas court reasonably concluded that the apparently negligent failure of petitioner's trial counsel to ensure that petitioner's confession was physically in the jury room during the jury's punishment-phase deliberations was nonetheless objectively reasonable.

Under such circumstances, the Texas Court of Criminal Appeals' determination that petitioner's first four claims of ineffective assistance herein failed to satisfy the deficient performance prong of *Strickland* was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

**65.** *See* notes 34–35, *supra,* and accompanying text.

**66.** Three different members of petitioner's petit jury testified to these facts at the hearing held on petitioner's motion for new trial. S.F. Trial, Volume XXVII, testimony of Marjorie Egloff, at pp. 1504 & 1508–10; testimony of Gordon H. Plank, at pp. 1522–24 & 1537; testimony of Marsha O. Williams, at p. 1549.

**67.** S.F. Trial, Volume XXVII, testimony of Gordon H. Plank, at pp. 1522–23; Trial Transcript, Volume III, at pp. 512–13.

**68.** Trial Transcript, Volume III, at p. 520.

### b. *No Prejudice*

■ In evaluating an ineffective assistance complaint about mitigating evidence that was never presented to a capital sentencing jury, a federal habeas court's review of the prejudice prong of *Strickland* requires the court to re-weigh the evidence in aggravation against the totality of available mitigating evidence. *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542.

As explained above, the testimony of Dr. Sellers presented during petitioner's state habeas corpus hearing was, at best, double-edged in nature in that, while it did tend to lay the blame for the grotesquely violent nature of petitioner's assault on Rodolfo Rodriguez on the night of the murders on petitioner's ingestion of cocaine and petitioner's resulting increased vulnerability to the influence of others, in so doing, Dr. Sellers' testimony also called the jury's attention to petitioner's history of long-term abuse of inhalants, dating back to petitioner's years in middle school, as well as petitioner's addiction to cocaine and the increased risk of aggressive behavior by petitioner likely to result from petitioner's continued cocaine abuse. Trial counsel's decision not to present double-edged evidence during the punishment phase of a capital trial will rarely support a finding of prejudice under *Strickland*. *See Harris v. Cockrell*, 313 F.3d 238, 244 (5th Cir.2002), *cert. denied*, 540 U.S. 1218, 124 S.Ct. 1503, 158 L.Ed.2d 152 (2004), (holding failure to present double-edged evidence regarding petitioner's propensity for future violence did not prejudice petitioner because of overwhelming evidence of violence in petitioner's background); *Johnson v. Cockrell*, 306 F.3d at 251 (holding petitioner was not prejudiced by the failure of his trial counsel to present evidence of petitioner's history of childhood abuse where such testimony would have impugned the credibility of petitioner's relatives, whose testimony supported petitioner's alibi defense, and there was strong evidence of petitioner's future dangerousness); *Dowthitt v. Johnson*, 230 F.3d 733, 745 (5th Cir.2000), *cert. denied*, 532 U.S. 915, 121 S.Ct. 1250, 149 L.Ed.2d 156 (2001), (holding petitioner therein not prejudiced by trial counsel's failure to present double-edged medical evidence); *Kitchens v. Johnson*, 190 F.3d 698, 703 (5th Cir. 1999) (failure to present double-edged evidence not prejudicial); *Nobles v. Johnson*, 127 F.3d at 422–24 (holding petitioner was not prejudiced by the absence of evidence showing petitioner's childhood abuse and emotional problems because such evidence would have helped the prosecution on the issue of whether petitioner posed a continuing threat to society); *Ransom v. Johnson*, 126 F.3d 716, 724 (5th Cir.1997), *cert. denied*, 522 U.S. 944, 118 S.Ct. 361, 139 L.Ed.2d 281 (1997), (holding petitioner not prejudiced by failure to discover and present double-edged evidence).

The Texas Court of Criminal Appeals acted in a wholly reasonable manner in concluding that petitioner was not prejudiced within the meaning of *Strickland* by the failure of his trial counsel to present any of the additional, potentially mitigating, evidence petitioner proffered during his state habeas corpus proceeding. Petitioner confessed in writing to having ingested large amounts of cocaine, conspiring with Guadalupe and Jesse Hernandez to rob their relatives, brutally stabbing Rodolfo Rodriguez, and sharing in the proceeds from the ensuing ransacking of the Rodriguez residence. Rodolfo Rodriguez's autopsy revealed the elderly man had been stabbed not less than 17 times, with at least 6 of those wounds potentially fatal. Following their murderous trio's return to their homes in Carrollton, petitioner received cash and several items of jewelry for his role in the offense. Petitioner also confessed his participation in the murders

to his wife and, when he ran short of cash several weeks later, went back to Guadalupe Hernandez and obtained several more items of stolen jewelry which he pawned for cash. Months after the murders, petitioner participated in a highly organized scheme to steal more half a million dollars worth of computers from his employer. While petitioner's jail disciplinary records did not include any violent incidents, petitioner's repeated violations of jail policy and rules evidenced a refusal to conform his behavior to reasonable restrictions on his behavior while incarcerated. Furthermore, the evidence introduced at petitioner's trial included testimony regarding an incident in which petitioner implicitly threatened a jail guard by seizing an orange from the guard's hand. The potentially mitigating value of petitioner's school records and additional testimony from petitioner's mother and sister regarding petitioner's history of childhood abuse at the hands of his father was collectively very weak.

In the face of a record establishing beyond any doubt the horrific nature of petitioner's crime and the absence of any evidence showing petitioner ever expressed sincere remorse for his crime prior to the date of his conviction, the state habeas court reasonably concluded that there was no reasonable probability that, but for the failure of petitioner's trial counsel to present double-edged evidence showing petitioner's long-term abuse of inhalants and cocaine addiction, the outcome of the punishment phase of petitioner's trial would have been any different.

D. *Failure to Object to Prosecutorial Comments*

1. *Clarifying the Issue*

In his state habeas corpus application, petitioner complained that the prosecu-

tion's closing argument at the punishment phase of trial included "several references" to petitioner's lack of remorse but identified only two instances specifically, i.e., the following portion of the prosecution's punishment-phase closing argument:

> And that popping noise, the nice lady, the nice lady who fixed them breakfast, the nice couple that lets them in, he has the human capacity to love? He's got the human capacity to kill people whose trust he gains. How much more easy do you think it would be for him to kill a total stranger? Remorse? The remorse? He continues to do drugs? They rifle through property. They take property with them. He gives away Mr. Rodriguez's rings as gifts. Where is the remorse? Where is the remorse? What does he do that Christmas? I can't find it. He's out partying. He's with his girlfriend, his wife. He had a Christmas. He had a Christmas after that. Where is the remorse? [69]

In his fifth claim for federal habeas relief herein, petitioner reiterates the same complaint about the prosecutor's comment and, once again, argues that the failure of his trial counsel to object to same constituted ineffective assistance.[70]

2. *State Court Disposition*

Petitioner argued in rather cryptic terms before the state habeas court that the foregoing references by the prosecutor to petitioner's apparent lack of remorse were collectively an illicit comment by the prosecution on petitioner's failure to testify at trial and that his trial counsel's failure to object to same on that ground constituted ineffective assistance.[71] The state ha-

**69.** S.F. Trial, Volume XXVI, at pp. 1483–84.

**70.** Amended Petition, at pp. 66–73.

**71.** State Habeas Transcript, at pp. 64–65.

The sum and substance of petitioner's allegations and argument in his state habeas corpus pleading in support of his forty-fourth claim for state habeas relief, i.e., the state habeas claim that corresponds to petitioner's

beas court concluded that (1) viewed in proper context, the prosecutor's comments were a wholly proper comment on the evidence before the jury and *not* a comment on petitioner's failure to testify at trial or to show remorse *at trial,* (2) any objection to the prosecutor's comments on those grounds would have been meritless, and (3) petitioner's trial counsel did not render ineffective assistance by failing to make such a meritless objection.[72]

### 3. AEDPA Review

#### a. No Deficient Performance

■ Having independently reviewed the entirety of the testimony at both phases of petitioner's trial and the closing arguments at the punishment phase of petitioner's trial, this Court concludes there was nothing unreasonable with the state habeas court's conclusions regarding the nature and propriety of the prosecution's comments in question. Rather than comments on petitioner's silence *during trial,* the prosecutor's rhetorical questions regarding the apparent lack of remorse demonstrated by petitioner in the months after the murders were wholly proper inferences drawn from the evidence then before the jury. The evidence showed that, during the months immediately following the murders, petitioner engaged in conduct that belied any assertion that petitioner felt remorse for his murder of Rodolfo Rodriguez. The prosecutor accurately pointed out that, during the period in question, the petitioner had not only given away various items of jewelry taken during the robbery-

murders but had also continued to abuse drugs and celebrated Christmas with his family, something Rodolfo and Virginia Rodriguez were unable to do. If anything, this portion of the prosecution's closing argument at the punishment phase of trial greatly understated what the evidence showed about petitioner's apparent lack of remorse for his brutal murder of Rodolfo Rodriguez in the months immediately thereafter.

■ The Fifth Amendment prohibits a prosecutor from commenting on a defendant's failure to testify. *Griffin v. California,* 380 U.S. 609, 614–15, 85 S.Ct. 1229, 1232–33, 14 L.Ed.2d 106 (1965); *Cotton v. Cockrell,* 343 F.3d 746, 751 (5th Cir.2003), *cert. denied,* 540 U.S. 1186, 124 S.Ct. 1417, 158 L.Ed.2d 92 (2004). In this Circuit, for there to have been a denial of the defendant's Fifth Amendment right to remain silent, either (1) the prosecutor's manifest intent in making the remark must have been to comment on the defendant's silence or (2) the character of the remark must have been such that the jury would naturally and necessarily have construed it as a comment on the defendant's silence. *Cotton v. Cockrell,* 343 F.3d at 751; *Barrientes v. Johnson,* 221 F.3d 741, 780 (5th Cir.2000), *cert. denied,* 531 U.S. 1134, 121 S.Ct. 902, 148 L.Ed.2d 948 (2001); *Jackson v. Johnson,* 194 F.3d 641, 652 (5th Cir. 1999), *cert. denied,* 529 U.S. 1027, 120 S.Ct. 1437, 146 L.Ed.2d 326 (2000). The prosecutor's remarks are not a manifest comment on the defendant's silence if there is some other, equally plausible, explanation

---

fifth claim for federal habeas relief herein, was as follows:

> During closing argument at the punishment phase of Applicant's trial the prosecutor made several references to Applicant's lack of remorse. Specifically, the prosecutor asked at least twice, where is the remorse? (RR: XXVI, 1483).
> The Court of Criminal Appeals has has [sic] held that commenting upon a defen-

dant's failure to show remorse during trial of the case is tantamount to a comment on his failure to testify when the record fails to reflect evidence of the defendant's actions during that trial. *Dickinson v. State,* 685 S.W.2d 320, 324 (Tex.Cr.App.1984).

**72.** State Habeas Transcript, at pp. 213–14.

for the remark. *Id.* As for whether the jury would naturally and necessarily construe a remark as a comment on the defendant's failure to testify, the question is not whether the jury possibly or even probably would view the challenged remark in this manner but whether the jury necessarily would have done so. *Id.*

As explained above, this Court's independent review of the record from petitioner's trial reveals that the prosecutor's comments in question focused not on the petitioner's silence *during trial but, rather,* on the evidence before the jury as to petitioner's unrepentant conduct in the months following the murders. Thus, there was no manifest intent on the prosecutor's part to comment on petitioner's failure to testify at trial. Furthermore, no reasonable jury could have so construed the prosecutor's comments in such a manner. Thus, petitioner's complaint regarding the prosecutor's comments in question do not rise to the level of an arguable, independent, federal constitutional violation.

However, petitioner has chosen to couch his fifth claim herein in the context of an ineffective assistance claim. Additionally, petitioner's assertion of this same claim during his state habeas corpus proceeding was supported exclusively with reference to governing state law principles. Therefore, this Court must also determine whether petitioner's trial counsel had other legal bases available to support an objection to the prosecutor's comments in question.

This Court concludes that the prosecutor's rhetorical questions regarding the lack of evidence showing any remorse by petitioner in the months immediately after the murders were a wholly appropriate response to the argument made by petitioner's lead trial counsel in his own closing argument suggesting that petitioner's immediate, visceral, reaction to the murders of Virginia Rodriguez and Paula Moran showed that petitioner felt remorse and shock, which also showed that petitioner possessed a conscience.[73]

 Under Texas law, proper closing argument by the prosecution in criminal trials fall into four general areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; and (4) pleas for law enforcement. *Wesbrook v. State,* 29 S.W.3d 103, 115 (Tex.Crim.App. 2000), *cert. denied,* 532 U.S. 944, 121 S.Ct. 1407, 149 L.Ed.2d 349 (2001); *Guidry v. State,* 9 S.W.3d 133, 154 (Tex.Crim.App. 1999), *cert. denied,* 531 U.S. 837, 121 S.Ct. 98, 148 L.Ed.2d 57 (2000); and *Hathorn v. State,* 848 S.W.2d 101, 117 (Tex.Crim.App. 1992), *cert. denied,* 509 U.S. 932, 113 S.Ct. 3062, 125 L.Ed.2d 744 (1993). *See also Buxton v. Collins,* 925 F.2d 816, 825 (5th Cir.1991), *cert. denied,* 498 U.S. 1128, 111 S.Ct. 1095, 112 L.Ed.2d 1197 (1991), (recognizing that the four proper areas for prosecutorial jury argument are summation of the evidence, reasonable inference from the evidence, answers to opposing counsel's argument, and pleas for law enforcement). The prosecutor's rhetorical questions during punishment-phase closing argument regarding the lack of evidence showing that petitioner experienced or demonstrated any remorse for the murder of Rodolfo Rodriguez in the months following same fell within the first three of the

---

**73.** S.F. Trial, Volume XXVI, at pp. 1471–72. More specifically, petitioner's trial counsel argued, in pertinent part, as follows: "And you saw his reaction to what happened. That's a conscience. And it doesn't—I'm not deprecating what happened, the act, but it's a sign of remorse and the shock to your system, when it's over and you are throwing up in the car and you won't take the purse or look—take the purse. That's not someone who takes pleasure in the pain of others."

four categories of proper jury argument recognized by both the Texas and federal courts.

Thus, the Texas Court of Criminal Appeals reasonably concluded that the failure of petitioner's trial counsel to object thereto did not cause the performance of said counsel to fall below an objective level of reasonableness. *See Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir.2002), *cert. denied*, 538 U.S. 926, 123 S.Ct. 1573, 155 L.Ed.2d 319 (2003), (holding there was nothing deficient in counsel's failure to object to the admission of psychiatric testimony that was admissible under then-existing precedent); *Robison v. Johnson*, 151 F.3d 256, 261 (5th Cir.1998), *cert. denied*, 526 U.S. 1100, 119 S.Ct. 1578, 143 L.Ed.2d 673 (1999), (nothing deficient regarding trial counsel's failure to seek admission of a document the state court concluded was inadmissible); *Emery v. Johnson*, 139 F.3d 191, 198 (5th Cir.1997), *cert. denied*, 525 U.S. 969, 119 S.Ct. 418, 142 L.Ed.2d 339 (1998), (failure to assert a meritless objection cannot be the grounds for a finding of deficient performance); *Meanes v. Johnson*, 138 F.3d 1007, 1012 (5th Cir.1998), *cert. denied*, 525 U.S. 968, 119 S.Ct. 417, 142 L.Ed.2d 338 (1998), (holding counsel was not constitutionally deficient for failing to raise an objection if, at the time of trial, the objection would have been futile in light of existing state law and the right asserted in the proposed objection was not clearly established); *Sones v. Hargett*, 61 F.3d 410, 415 n. 5 (5th Cir.1995) ("Counsel cannot be deficient for failing to press a frivolous point."); *United States v. Gibson*, 55 F.3d 173, 179 (5th Cir.1995) ("Counsel is not required by the Sixth Amendment to file meritless motions."); *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir.1990) ("[C]ounsel is not required to make futile motions or objections."); *Murray v. Maggio*, 736 F.2d 279, 283 (5th Cir.1984) ("Counsel is not required to engage in the filing of futile motions."). The state habeas court

reasonably concluded that petitioner's failure to object to the prosecutor's comments in question was little more than a failure to make a meritless objection.

### b. *No Prejudice*

The state habeas court did not expressly address the prejudice prong of *Strickland* in its analysis of this claim during petitioner's state habeas corpus proceeding. Having independently reviewed the entire record from petitioner's trial, this Court concludes *de novo* that petitioner was not "prejudiced" within the meaning of *Strickland* by the failure of petitioner's trial counsel to make what would have been a wholly meritless objection to the prosecutor's comments in question.

### E. *Conclusions*

None of petitioner's complaints about the performance of his trial counsel satisfy either prong of *Strickland*. Therefore, the Texas Court of Criminal Appeals' rejections on the merits of petitioner's complaints regarding his trial counsel's failures to present additional mitigating evidence or to object to the prosecution's comments regarding petitioner's apparent lack of remorse were neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

## V. *Brady Claim*

### A. *The Claim*

In his sixth claim herein, petitioner argues that the prosecution failed to disclose to petitioner's trial counsel that it had in its possession a memorandum dated May

13, 1994 suggesting that the petitioner had been "cleared" and was no longer a suspect in connection with the January, 1994 theft of more than half a million dollars worth of computers from a warehouse in Carrollton.[74]

B. *State Court Disposition*

As explained above, during the punishment phase of trial, a number of prosecution witnesses, including a Carrollton arson investigator, testified regarding petitioner's involvement in the January, 1994 theft of a large quantity of laptop computers from a Carrollton warehouse.[75] More specifically, the arson investigator testified at trial that, while the initial investigation of the January, 1994 theft had been unproductive, following an arson on October 24, 1994, he discovered a link between that offense and the January 14, 1994 theft which eventually resulted in petitioner's indictment in connection with the earlier crime.[76] The lead prosecutor at petitioner's trial testified during petitioner's state habeas corpus hearing that (1) she was aware, at least as early as January, 1995, that petitioner had been indicted in connection with the January, 1994 theft, (2) she had communicated that information to petitioner's trial counsel well in advance of trial, and (3) while she disclosed neither the May 13, 1994 report nor its contents to petitioner's trial counsel, that report was factually inaccurate insofar as it indicated petitioner had been cleared of suspicion in connection with the January, 1994 theft.[77] The state habeas court rejected this claim on the merits, (1) finding the report had been prepared while the investigation of the January, 1994 theft was "incomplete" and that the report was factually inaccurate and (2) concluding that, because the May 13, 1994 report was factually inaccurate, by the time of petitioner's trial the report was not "material" to the outcome of petitioner's trial.[78]

C. *Clearly Established Federal Law*

Few constitutional principles are more firmly established by Supreme Court precedent than the rule that " 'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' " *Banks v. Dretke*, 540 U.S. 668, 691, 124 S.Ct. 1256, 1272, 157 L.Ed.2d 1166 (2004) (*quoting Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963)). The Supreme Court has consistently held that the prosecution's duty to disclose evidence material to either guilt or punishment, i.e., the rule announced in *Brady v. Maryland*, applies even when there has been no request by the accused. *Banks v. Dretke*, 540 U.S. at 690, 124 S.Ct. at 1272 (*quoting Strickler v. Greene*, 527 U.S. 263, 280, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999)); *United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976). This duty applies to impeachment evidence. *Strickler v. Greene*, 527 U.S. at 280, 119 S.Ct. at 1948; *United States v. Bagley*, 473 U.S. 667, 676 & 685, 105 S.Ct. 3375, 3380 & 3385, 87 L.Ed.2d 481 (1985). The rule encompasses evidence known only to police

---

74. Amended Petition, at pp. 73–84.

75. *See* note 14, *supra,* and accompanying text.

76. S.F. Trial, Volume XXV, testimony of David Mark Howell, at pp. 1129–32, 1143–46, & 1151–53.

77. S.F. State Habeas hearing, Volume 1 of 3, testimony of Mary Ellen Smyth, at pp. 86–89.

78. State Habeas Transcript, at pp. 226–31.

investigators and not to the prosecutor. *Strickler v. Greene,* 527 U.S. at 280–81, 119 S.Ct. at 1948; *Kyles v. Whitley,* 514 U.S. 419, 438, 115 S.Ct. 1555, 1568, 131 L.Ed.2d 490 (1995). "[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." *Strickler v. Greene,* 527 U.S. at 281, 119 S.Ct. at 1948 (*quoting Kyles v. Whitley,* 514 U.S. at 437, 115 S.Ct. at 1567).

Under clearly established Supreme Court precedent, there are three elements to a *Brady* claim: (1) the evidence must be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be "material," i.e., prejudice must have ensued from its non-disclosure. *Banks v. Dretke,* 540 U.S. at 691, 124 S.Ct. at 1272; *Strickler v. Greene,* 527 U.S. at 281–82, 119 S.Ct. at 1948. Evidence is "material" under *Brady* where there exists a "reasonable probability" that had the evidence been disclosed the result at trial would have been different. *Banks v. Dretke,* 540 U.S. at 698–99, 124 S.Ct. at 1276.

■■■■ The Supreme Court has emphasized four aspects of the *Brady* materiality inquiry. First, a showing of materiality does *not* require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted in the defendant's acquittal. *See United States v. Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383 (expressly adopting the "prejudice" prong of the *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), analysis of ineffective assistance claims as the appropriate standard for determining "materiality" under *Brady*). Second, the materiality standard is *not* a sufficiency of the evidence test. *Kyles v. Whitley,* 514 U.S. at 434–35, 115 S.Ct. at 1566. Third, once materiality is established, harmless error analysis has no application. *Kyles v. Whitley,* 514 U.S. at 435–36, 115 S.Ct. at 1566–67. Finally, materiality must be assessed collectively, not item by item. *Kyles v. Whitley,* 514 U.S. at 436–37, 115 S.Ct. at 1567.

### D. *AEDPA Review*

■■■■ There was no dispute at either the time of petitioner's trial or during petitioner's state habeas corpus hearing that the key break in ascertaining the identities of those, including petitioner, who had been involved in the January, 1994 theft of laptop computers from a Carrollton, Texas warehouse, came in the days immediately following an October 24, 1994 fire at another Carrollton warehouse.[79] It was likewise undisputed that, in the days after that latter offense, law enforcement agents obtained a confession from Mark Jordan identifying himself, petitioner, and others in the January, 1994 theft.[80] Finally, there has never been any dispute over the fact that, as of the date of petitioner's trial, petitioner was under indictment in connection with the January, 1994 theft. Under such circumstances, the Texas Court of Criminal Appeals' factual finding that the May 13, 1994 report was factually inaccurate as of the date of petitioner's trial is unassailable. Petitioner presented the state habeas court with no evidence whatsoever showing the report was an accurate reflection of then-existing reality as of January, 1995.

---

**79.** S.F. Trial, Volume XXV, testimony of David Mark Howell, at pp. 1129–32 & 1143–46; testimony of Mark D. Jordan, at pp. 1165–76 & 1184–86.

**80.** Id.

Accordingly, the Texas Court of Criminal Appeals' conclusion that the report was not "material" within the meaning of *Brady* is likewise not reasonably subject to challenge. Assuming that petitioner's trial counsel had been given possession of the report in question prior to trial, the report would have been of no utility whatsoever at trial. First, the report itself was inadmissible hearsay. Furthermore, because law enforcement agents did not obtain the "break" they needed in their investigation of the January, 1994 theft until many months after the report was drafted, and because the information concerning petitioner contained in that report was rendered factually inaccurate by subsequent events, petitioner's trial could not have used the report to impeach any prosecution witness during the punishment phase of petitioner's trial. Finally, any attempt to employ the report to challenge the accuracy of prosecution witnesses who had testified that a criminal charge was then pending against petitioner in connection with the January, 1994 theft would likely have been met by the prosecution with introduction of a certified copy of the indictment then-pending against petitioner.

Under such circumstances, there is no reasonable probability that, but for the failure of the prosecution to disclose the May 13, 1994 report to petitioner's trial counsel, the outcome of either phase of petitioner's trial would have been any different. The Texas Court of Criminal Appeals' rejection on the merits of petitioner's *Brady* claim was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial and state habeas corpus proceeding.

## VI. *Hung Jury Instruction Claim*

### A. *The Claim*

In his seventh claim for relief herein, petitioner argues that his constitutional rights were violated because the jury was never instructed regarding the effect of a hung jury during the punishment phase of trial.[81]

### B. *State Court Disposition*

On direct appeal, the Texas Court of Criminal Appeals summarily denied relief on petitioner's forty-second point of error, i.e., petitioner's complaint that his jury was denied an instruction regarding the effect of a single hold-out juror at the punishment phase of trial.[82] When petitioner re-urged this same claim as his fifty-ninth claim in his state habeas corpus proceeding, the Texas Court of Criminal Appeals summarily rejected it based upon its prior ruling on direct appeal and well-settled state law authority.[83]

### C. *AEDPA Review*

The Supreme Court rejected the arguments underlying petitioner's penultimate claim herein when it held in *Jones v. United States*, 527 U.S. 373, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999), that the Eighth Amendment does *not* require that a jury be instructed as the effect of a "breakdown in the deliberative process," because (1) the refusal to give such an instruction does not affirmatively mislead the jury regarding the effect of its verdict and (2) such an instruction might well undermine the strong governmental interest

---

**81.** Amended Petition, at pp. 85–101.

**82.** *Prieto v. State,* No. 72,133 (slip op.) at p. 48.

**83.** State Habeas Transcript, at pp. 222–23.

in having the jury express the conscience of the community on the ultimate question of life or death. *Jones v. United States,* 527 U.S. at 382, 119 S.Ct. at 2099. The Supreme Court has never held that a jury instruction of the type requested by petitioner in his seventh claim herein is constitutionally mandated.

Petitioner complains that the state trial court's failure to advise the petitioner's jury regarding the effect of a hung jury violated the principles announced by the Supreme Court in *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), and *McKoy v. North Carolina,* 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990), because the state trial court, pursuant to a statutory prohibition, failed to inform the jury at the punishment phase of trial as to the effect of a *single* "no" vote on any of the Texas capital sentencing special issues. Neither of these Supreme Court opinions supports the result urged by petitioner herein.

In *Mills,* the Supreme Court remanded a death sentence for a new sentencing proceeding where the verdict form and the trial judge's instructions could have been construed by the jury as preventing it from considering any mitigating circumstance in weighing those mitigating circumstances against the aggravating circumstances it had found established by the evidence unless the jury unanimously agreed the mitigating circumstance had been established by the evidence. *Mills,* 486 U.S. at 384, 108 S.Ct. at 1870. The Supreme Court held in *Mills* that a capital sentencing scheme which grants to a single holdout juror the power to exclude jury consideration of a mitigating circumstance when weighing the mitigating and aggravating circumstances violated the Eighth Amendment's requirement that a capital sentencing authority may not be precluded from considering, as a mitigating factor, any evidence relating to the defendant's character or record or any of the circumstances of the offense the defendant offers as a basis for a sentence of less than death. *Id.,* 486 U.S. at 374–75, 108 S.Ct. at 1865–66.

In *McKoy,* the Supreme Court, relying on its holding in *Mills,* struck down a capital sentencing scheme in another "weighing jurisdiction" under which the jury was permitted to weigh against the aggravating factors it had unanimously found established beyond a reasonable doubt only those "mitigating circumstances" which it unanimously found had been established by a preponderance of the evidence. *McKoy,* 494 U.S. at 444, 110 S.Ct. at 1234. As it held in *Mills,* the Supreme Court's holding in *McKoy* turned on the preclusive impact on the jury's subsequent "weighing" analysis of a single juror's refusal to find a particular mitigating circumstance had been established by the evidence. *Id.,* 494 U.S. at 440–43, 110 S.Ct. at 1232–34. Petitioner's jury was never faced with the type of weighing responsibility involved in *McKoy.* Texas is not a weighing jurisdiction for Eighth Amendment purposes. *See Hughes v. Johnson,* 191 F.3d 607, 623 (5th Cir.1999), *cert. denied,* 528 U.S. 1145, 120 S.Ct. 1003, 145 L.Ed.2d 945 (2000), (holding that Texas is not a weighing state); and *James v. Collins,* 987 F.2d 1116, 1120 (5th Cir.1993), *cert. denied,* 509 U.S. 947, 114 S.Ct. 30, 125 L.Ed.2d 780 (1993), (recognizing that, unlike a weighing jurisdiction, Texas sentencing juries are not called upon to weigh statutory aggravating factors against mitigating evidence). Thus, the holding in *McKoy* is inapplicable to the punishment phase of petitioner's capital murder trial.

Essentially, petitioner's seventh claim herein complains that individual members of his jury were not furnished with a detailed explanation of exactly what constituted a "hung jury" at the punishment

phase of a Texas capital murder trial. However, the Fifth Circuit has expressly rejected this same argument, noting that the law in Texas, a non-weighing jurisdiction, is completely different from that in *Mills:*

> Under the Texas system, all jurors can take into account any mitigating circumstance. One juror cannot preclude the entire jury from considering a mitigating circumstance. Thus, *Mills* is inapplicable.
>
> The Texas system allows an answer of "Yes" to a special issue if all jurors vote "Yes," and allows an answer of "No" if ten jurors vote "No." *Mills* does not require a certain number of jurors to agree to impose the death penalty.

*Jacobs v. Scott,* 31 F.3d 1319, 1328–29 (5th Cir.1994), *cert. denied,* 513 U.S. 1067, 115 S.Ct. 711, 130 L.Ed.2d 618 (1995).

In order to successfully challenge a state court's jury instructions at the punishment phase of a capital murder trial, a federal habeas petitioner must show more than that a capital sentencing scheme *might* have resulted in the jury being prevented from considering mitigating evidence; the petitioner must show a reasonable likelihood that such actually occurred. *Boyde v. California,* 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990). In this case, petitioner's argument that the jurors at his Texas capital murder trial might have concluded from the jury instructions at the punishment phase of trial that they were precluded from giving effect to their own opinions as to whether petitioner merited the death penalty asserts a construction of the punishment phase jury instructions at petitioner's trial that is neither reasonable nor likely to have actually occurred. *See Johnson v. Texas,* 509 U.S. 350, 368, 113 S.Ct. 2658, 2669, 125 L.Ed.2d 290 (1993): "In evaluating the instructions, we do not engage in a technical parsing of this language of the instructions, but instead approach the instructions in the same way that the jury would—with a 'commonsense understanding of the instructions in the light of all that has taken place at trial.'" *quoting Boyde v. California,* 494 U.S. at 381, 110 S.Ct. at 1198.

Furthermore, the Fifth Circuit has rejected the exact same Fourteenth Amendment and Eighth Amendment claims urged by petitioner herein. *See Alexander v. Johnson,* 211 F.3d 895, 897 (5th Cir.2000)(specifically rejecting both Fourteenth and Eighth Amendment challenges to the Texas ten:twelve rule in the course of affirming this Court's rejection of claims identical to those raised by petitioner herein); *Miller v. Johnson,* 200 F.3d 274, 288–89 (5th Cir.2000), *cert. denied,* 531 U.S. 849, 121 S.Ct. 122, 148 L.Ed.2d 77 (2000) (holding *Mills* inapplicable to a Texas capital sentencing proceeding); *Woods v. Johnson,* 75 F.3d 1017, 1036 (5th Cir.1996), *cert. denied,* 519 U.S. 854, 117 S.Ct. 150, 136 L.Ed.2d 96 (1996) (holding the same); and *Jacobs v. Scott,* 31 F.3d at 1328–29 (holding the same). There is no "clearly established" constitutional right to a jury instruction advising a capital sentencing jury of the effect of a hung jury. *See United States v. Jones,* 132 F.3d 232, 245 (5th Cir.1998), *affirmed,* 527 U.S. 373, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999), (holding that no constitutional violation results from the refusal of a district court to inform the jury of the consequences of failing to reach a unanimous verdict).

Under such circumstances, the Texas Court of Criminal Appeals' rejection on the merits of petitioner's seventh claim herein was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor the product of an unreasonable determination of the facts in light of the

evidence presented in petitioner's state habeas corpus proceeding.

### D. *Teague Foreclosure*

 Furthermore, as pointed out by respondent, adoption of the rule advocated by petitioner in his seventh claim herein is foreclosed by the non-retroactivity doctrine of *Teague v. Lane,* 489 U.S. 288, 310, 109 S.Ct. 1060, 1075, 103 L.Ed.2d 334 (1989). Under the Supreme Court's holding in *Teague,* federal courts are generally barred from applying new constitutional rules of criminal procedure retroactively on collateral review. *Caspari v. Bohlen,* 510 U.S. 383, 389–90, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994). A "new rule" for *Teague* purposes is one which was not dictated by precedent existing at the time the defendant's conviction became final. *See O'Dell v. Netherland,* 521 U.S. 151, 156, 117 S.Ct. 1969, 1973, 138 L.Ed.2d 351 (1997), (holding that a "new rule" either "breaks new ground," "imposes a new obligation on the States or the Federal Government," or was not "dictated by precedent existing at the time the defendant's conviction became final") Under this doctrine, unless reasonable jurists hearing the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to rule in his favor, a federal habeas court is barred from doing so on collateral review. *Id.*

 The holding in *Teague* is applied in three steps: first, the court must determine when the petitioner's conviction became final; second, the court must survey the legal landscape as it then existed and determine whether a state court considering the petitioner's claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule he seeks was required by the Constitution; and third, if the rule advocated by the petitioner is a new rule, the court must determine whether the rule

falls within one of the two narrow exceptions to the non-retroactivity principle. *See Caspari v. Bohlen,* 510 U.S. at 390, 114 S.Ct. at 953.

 The only two exceptions to the *Teague* non-retroactivity doctrine are reserved for (1) new rules forbidding criminal punishment of certain primary conduct and rules prohibiting a certain category of punishment for a class of defendants because of their status or offense and (2) "watershed" rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding, i.e., a small core of rules requiring observance of those procedures that are implicit in the concept of ordered liberty. *O'Dell v. Netherland,* 521 U.S. at 157, 117 S.Ct. at 1973. A conviction becomes final for *Teague* purposes when either the United States Supreme Court denies a certiorari petition on the defendant's direct appeal or the time period for filing a certiorari petition expires. *Caspari v. Bohlen,* 510 U.S. at 390, 114 S.Ct. at 953. Petitioner's conviction became final for *Teague* purposes not later than March 17, 1999, i.e., 91 days after the date the Texas Court of Criminal Appeals issued its opinion affirming petitioner's conviction on direct appeal and the date petitioner's deadline for filing a petition for writ of certiorari with the United States Supreme Court expired. *Beard v. Banks,* 542 U.S. 406, ——, 124 S.Ct. 2504, 2510, 159 L.Ed.2d 494 (2004)(recognizing that a state criminal conviction ordinarily becomes final for *Teague* purposes when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for writ of certiorari has elapsed or a timely filed petition for certiorari has been denied); 21 U.S.C. § 2101(d) (the deadline for filing a certiorari petition from a state criminal conviction shall be established by Supreme Court rule); Sup. Ct. Rule 13.1. *Teague* remains applicable

after the passage of the AEDPA. *See Horn v. Banks,* 536 U.S. 266, 268–72, 122 S.Ct. 2147, 2148–51, 153 L.Ed.2d 301 (2002)(applying *Teague* in an AEDPA context); *Robertson v. Cockrell,* 325 F.3d 243, 255 (5th Cir.2003), *cert. denied,* 539 U.S. 979, 124 S.Ct. 28, 156 L.Ed.2d 691 (2003)(recognizing the continued vitality of the *Teague* non-retroactivity doctrine under the AEDPA).

■■■ Admittedly, the Supreme Court has recognized that individualized sentencing is an important goal in the capital sentencing process. *See Jones v. United States,* 527 U.S. 373, 381, 119 S.Ct. 2090, 2098, 144 L.Ed.2d 370 (1999)(recognizing that, at the selection phase, capital sentencing decisions must rest upon an individualized inquiry, which allows broad inquiry into the constitutionally relevant mitigating evidence); *Buchanan v. Angelone,* 522 U.S. 269, 276, 118 S.Ct. 757, 761, 139 L.Ed.2d 702 (1988)(recognizing that, in the selection phase of a capital sentencing proceeding, there is a need for a broad inquiry into all relevant mitigating evidence to allow an individualized determination); *Tuilaepa v. California,* 512 U.S. 967, 972, 114 S.Ct. 2630, 2635, 129 L.Ed.2d 750 (1994)(holding "what is important at the selection phase is an individualized determination on the basis of the character of the individual and the circumstances of the crime"), *quoting Zant v. Stephens,* 462 U.S. 862, 879, 103 S.Ct. 2733, 2743–44, 77 L.Ed.2d 235 (1983). However, the Supreme Court has never held that this consideration mandates that a capital sentencing jury be instructed that a single juror's hold-out on any capital sentencing special issue will result in the imposition of a life sentence.

The rule advocated by petitioner in his seventh claim herein was most certainly *not* mandated by existing Supreme Court precedent as of the date petitioner's conviction became final. Thus, *Teague* forbids this Court from adopting such a new rule in the context of this federal habeas corpus proceeding.

## VII. *Jury Misconduct Claim*

### A. *The Claim*

In his eighth and final claim herein, petitioner argues that his federal constitutional rights were violated when a juror chose to ignore the trial court's clear instructions and vote in favor of a death sentence for petitioner based on erroneous information conveyed to that juror during the jury's punishment-phase deliberations.[84]

### B. *State Court Disposition*

On direct appeal, the Texas Court of Criminal Appeals held the jury misconduct claim presented by petitioner therein arose solely based on state law and rejected same on the merits.[85] When petitioner re-urged this same complaint as part of a wave of complaints regarding the trial court's denial of his motion for new trial based on jury misconduct, the state habeas court summarily rejected the claim based on its earlier holding on direct appeal and a state procedural rule barring petitioner from presenting a new legal gloss on this same complaint in a state habeas corpus proceeding when petitioner could have presented the same claim on direct appeal.[86]

### C. *Violation of State Law Not a Basis for Federal Habeas Relief*

■■■ Insofar as petitioner argues that the Texas Court of Criminal Appeals erro-

---

84. Amended Petition, at pp. 101–22.

85. *Prieto v. State,* No. 72,133 (slip op.) at pp. 30–44.

86. State Habeas Transcript, at pp. 177–79.

neously applied state procedural rules regarding the granting of a motion for new trial based on jury misconduct, those arguments, which comprise the majority of petitioner's argument supporting his final claim herein, are foreclosed by the well-settled principle that federal habeas relief lies only to rectify a violation of federal constitutional rights. *See Montoya v. Scott,* 65 F.3d 405, 418–20 (5th Cir.1995), *cert. denied,* 517 U.S. 1133, 116 S.Ct. 1417, 134 L.Ed.2d 542 (1996), (recognizing that an allegation that a juror was acquainted with the victim does not, standing alone, establish bias sufficient to disqualify the juror from service). An alleged violation of state law does not, standing alone, furnish a basis for federal habeas corpus relief absent a showing the violation rendered the entire trial fundamentally unfair. *See Engle v. Isaac,* 456 U.S. 107, 119, 102 S.Ct. 1558, 1567, 71 L.Ed.2d 783 (1982)(holding the state trial court's alleged failure to correctly instruct a jury on Ohio law regarding self-defense did not furnish a basis for federal habeas relief); *Fuller v. Johnson,* 158 F.3d 903, 908 (5th Cir.1998), *cert. denied,* 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999), (holding a convicted capital murder defendant's complaint that one of his jurors was disqualified from jury service under Texas law failed to assert a basis for federal habeas relief in the absence of a showing that the juror's service rendered the entire trial fundamentally unfair).

Federal habeas corpus relief will not issue to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also presented. *Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991)(holding complaints regarding the admission of evidence under California law did not present grounds for federal habeas relief absent a showing that admission of the evidence in question violated due process); *Lewis v. Jeffers,* 497 U.S. 764, 780, 110 S.Ct. 3092, 3102, 111 L.Ed.2d 606 (1990)(recognizing that federal habeas relief will not issue for errors of state law); *Pulley v. Harris,* 465 U.S. 37, 41, 104 S.Ct. 871, 874, 79 L.Ed.2d 29 (1984)(holding a federal court may not issue the writ on the basis of a perceived error of state law).

■ In the course of reviewing state criminal convictions in federal habeas corpus proceedings, a federal court does *not* sit as a super-state appellate court. *Estelle v. McGuire,* 502 U.S. at 67–68, 112 S.Ct. at 480; *Lewis v. Jeffers,* 497 U.S. at 780, 110 S.Ct. at 3102; *Pulley v. Harris,* 465 U.S. at 41, 104 S.Ct. at 874. "When a federal district court reviews a state prisoner's habeas petition pursuant to 28 U.S.C. § 2254 it must decide whether the petitioner is 'in custody in violation of the Constitution or laws or treaties of the United States.' The court does not review a judgment, but the lawfulness of the petitioner's custody *simpliciter.*" *Coleman v. Thompson,* 501 U.S. 722, 730, 111 S.Ct. 2546, 2554, 115 L.Ed.2d 640 (1991). Thus, even if petitioner had established that the alleged misconduct of juror Egloff entitled him to a new trial under applicable Texas law, that fact did not, standing alone, establish a violation of petitioner's federal constitutional rights.

D. *Procedural Default on Federal Aspects of the Claim*

■ Insofar as petitioner attempts to assert *federal* constitutional claims arising out of the state trial court's denial of that portion of petitioner's motion for new trial that was premised on alleged jury misconduct, petitioner procedurally defaulted on those claims by failing to present them to the Texas Court of Criminal Appeals on direct appeal. More specifically, on direct appeal, the Texas Court of Criminal Appeals concluded that petitioner's complaints of jury misconduct were premised

exclusively on state law.[87] In the course of its disposition of petitioner's first eight claims for state habeas corpus relief, including petitioner's complaints that the denial of his motion for new trial violated federal constitutional principles, the Texas Court of Criminal Appeals held that petitioner had procedurally defaulted on those claims by failing to present same as points of error during petitioner's direct appeal.[88]

The Texas Court of Criminal Appeals expressly adopted the state habeas trial court's conclusion that petitioner procedurally defaulted on his federal jury misconduct claim by failing to present same on direct appeal.

■■■ Procedural default occurs where (1) a state court clearly and expressly bases its dismissal of a claim on a state procedural rule and that procedural rule provides an independent and adequate ground for the dismissal or (2) the petitioner fails to exhaust all available state remedies and the state court to which he would be required to petition would now find the claims procedurally barred. *Coleman v. Thompson,* 501 U.S. at 735 n. 1, 111 S.Ct. at 2557 n. 1. In either instance, the petitioner is deemed to have forfeited his federal habeas claim. *O'Sullivan v. Boerckel,* 526 U.S. 838, 848, 119 S.Ct. 1728, 1734, 144 L.Ed.2d 1 (1999). However, such procedural defaults only bar federal habeas review when the state procedural rule that forms the basis for the procedural default was "firmly established and regularly followed" by the time it was applied to preclude state judicial review of the merits of

a federal constitutional claim. *Ford v. Georgia,* 498 U.S. 411, 424, 111 S.Ct. 850, 857–58, 112 L.Ed.2d 935 (1991).

Petitioner alleges no facts, and cites this Court to no Texas case law, showing that the foregoing principle of state procedural default has been inconsistently followed by the state appellate courts in similar contexts. More specifically, petitioner identifies no instances in which the Texas Court of Criminal Appeals has entertained the merits of a federal constitutional jury misconduct claim when that claim was raised for the first time in a state habeas corpus application. More importantly, the Fifth Circuit has recognized that the same procedural default rule relied upon by the Texas Court of Criminal Appeals in its adopted findings and conclusions denying state habeas corpus relief was "firmly established" for federal procedural default purposes before the date the Texas Court of Criminal Appeals disposed of petitioner's direct appeal (i.e., December 16, 1998). *See Busby v. Dretke,* 359 F.3d 708, 719 (5th Cir.2004), *cert. denied,* 541 U.S. 1087, 124 S.Ct. 2812, 159 L.Ed.2d 249 (2004), (holding the Texas Court of Criminal Appeals' opinion in *Ex parte Gardner,* 959 S.W.2d 189, 199 (Tex.Crim.App.1996) *modified* on motion for rehearing on February 2, 1998, to recognize this new procedural default rule, "firmly entrenched" that procedural default rule on that date). Thus, petitioner has procedurally defaulted on his *federal* jury misconduct claim.

The Supreme Court has recognized exceptions to the doctrine of procedural

---

**87.** *Prieto v. State,* No. 72,133 (slip op.), at p. 43.

This Court's independent review of petitioner's appellant's brief on direct appeal confirms the accuracy of this determination. Petitioner cited to absolutely federal authority in support of his sixteenth through eighteenth points of error on direct appeal and furnished the Texas Court of criminal Appeals with no argument could rationally be construed as

asserting a *federal* constitutional claim arising out of the trial court's denial of that portion of his motion for new trial that was premised on alleged jury misconduct. Pages 86–93 of appellant's brief on direct appeal are bereft of any citation to authority or any argument that "fairly presented' the state appellate court with a federal constitutional claim."

**88.** State Habeas Transcript, at pp. 178–79

default where a federal habeas corpus petitioner can show "cause and actual prejudice" for his default or that failure to address the merits of his procedurally defaulted claim will work a "fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. at 750, 111 S.Ct. at 2565; *Harris v. Reed,* 489 U.S. 255, 262, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989). To establish "cause," a petitioner must show either that some objective external factor impeded the defense counsel's ability to comply with the state's procedural rules or that Gutierrez's trial or appellate counsel rendered ineffective assistance. *Coleman v. Thompson,* 501 U.S. at 753, 111 S.Ct. at 2566; *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986) (holding that proof of ineffective assistance by counsel satisfies the "cause" prong of the exception to the procedural default doctrine). While a showing of ineffective assistance can satisfy the "cause" prong of the "cause and actual prejudice" exception to the procedural default doctrine, petitioner has presented this Court with no allegations of ineffective assistance by his state appellate counsel.

In order to satisfy the "miscarriage of justice" test, the petitioner must supplement his constitutional claim with a colorable showing of factual innocence. *Sawyer v. Whitley,* 505 U.S. 333, 335–36, 112 S.Ct. 2514, 2519, 120 L.Ed.2d 269 (1992).

To satisfy the "factual innocence" standard at the guilt-innocence phase of a capital trial, a petitioner must establish a fair probability that, considering all of the evidence now available, the trier of fact would have entertained a reasonable doubt as to the defendant's guilt. *See Sawyer v. Whitley,* 505 U.S. at 335–40, 112 S.Ct. at 2517–19, (holding that to show "actual innocence" in the context of a capital sentencing scheme, one must show by clear and convincing evidence that, but for the constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state statute and that "factual innocence" means a fair probability that, in light of all the evidence, the trier of the facts would have entertained a reasonable doubt as to the defendant's guilt). In other words, to satisfy the "factual innocence" standard, a petitioner must establish a fair probability that, considering all of the evidence now available, the trier of fact would have entertained a reasonable doubt as to the defendant's guilt. *Id.* The "factual innocence" test, therefore, requires the Court to give consideration to the all of the evidence now available to the Court on the issue of the petitioner's guilt or innocence. The defendant must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him. *Bousley v. United States,* 523 U.S. 614, 623, 118 S.Ct. 1604, 1611, 140 L.Ed.2d 828 (1998).

The Supreme Court has held that a showing of "actual innocence" is made in connection with the punishment phase of a capital murder trial when a petitioner shows by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found petitioner eligible for the death penalty under applicable state law. *Sawyer v. Whitley,* 505 U.S. at 346–48, 112 S.Ct. at 2523. The Supreme Court explained in *Sawyer v. Whitley* that this "actual innocence" requirement focuses on those elements which render a defendant *eligible* for the death penalty and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error. *Sawyer v. Whitley,* 505 U.S. at 347, 112 S.Ct. at 2523. Writing for this Court, former District Judge, now Circuit Judge, Edward Prado summarized clearly established Supreme Court jurisprudence on this subject as follows:

In *Tuilaepa v. California*, the Supreme Court distinguished the two aspects of the capital decision-making process, i.e., the eligibility decision and the selection process, and emphasized that, while both inquiries necessarily involve resolution of issues that bear a factual nexus to the crime, the selection process must also focus on the character and record of the defendant. In *Buchanan v. Angelone*, the Supreme Court reaffirmed the vitality of the two-stage *Tuilaepa* analysis and rejected an argument that the Constitution mandates jury instructions at the selection stage of a capital sentencing proceeding regarding the nature of mitigating evidence or the manner in which the sentencing jury is to consider specific statutorily-defined mitigating factors, such as the defendant's age, lack of prior criminal activity, extreme emotional or mental disturbance, and significantly impaired capacity to appreciate the criminality of his conduct.

The first part of the *Tuilaepa* analysis, i.e., the eligibility decision, was discussed by the Supreme Court in *Loving v. United States:*

> The Eighth Amendment requires, among other things, that "a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" Some schemes accomplish that narrowing by requiring that the sentencer find at least one aggravating circumstance. The narrowing

may also be achieved, however, in the definition of the capital offense, in which circumstance the requirement that the sentencer "find the existence of the aggravating circumstance in addition is no part of the constitutionally required narrowing process."

*Cordova v. Johnson*, 993 F.Supp. 473, 494–95 (W.D.Tex.1998), *affirmed,* 157 F.3d 380 (5th Cir.1998), *cert. denied,* 525 U.S. 1131, 119 S.Ct. 922, 142 L.Ed.2d 971 (1999) (footnotes omitted).

In Texas, unlike the Louisiana capital sentencing scheme the Supreme Court addressed in *Sawyer v. Whitley*, the constitutionally-required "eligibility decision" is made at the guilt-innocence phase of trial by virtue of the manner in which Texas law narrowly defines the offense of capital murder. *Johnson v. Texas*, 509 U.S. 350, 362, 113 S.Ct. 2658, 2666, 125 L.Ed.2d 290 (1993) (holding that its previous opinions upholding the Texas capital sentencing scheme found no constitutional deficiency in the means used to narrow the group of offenders subject to capital punishment because the Texas Penal Code itself adopted five different classifications of murder for that purpose); *Lowenfield v. Phelps*, 484 U.S. 231, 243–47, 108 S.Ct. 546, 554–55, 98 L.Ed.2d 568 (1988); *Jurek v. Texas*, 428 U.S. 262, 268–75, 96 S.Ct. 2950, 2955–57, 49 L.Ed.2d 929 (1976).

If this Court were to apply the Supreme Court's holding in *Sawyer v. Whitley* literally, a *Texas* prisoner challenging his death *sentence* while not contesting his capital murder *conviction* could satisfy the "actual innocence" standard of *Sawyer* only by showing he was *not* guilty of capital murder.[89] Such an anomalous result is

---

89. Such a rigid application of the literal language in *Sawyer v. Whitley* would mean petitioner could satisfy the "actual innocence" standard with regard to his sentence only if he satisfied the "actual innocence" standard with regard to his underlying capital murder conviction. Neither logic nor a fair appraisal

of the Supreme Court's holding in *Sawyer v. Whitley* requires such a knee-jerk application of the language in *Sawyer* by this Court. On the contrary, this Court's review of the opinion in *Sawyer v. Whitley* reveals that the Supreme Court clearly intended to focus a re-

avoided, however, by employing the far more logical approach suggested by the Fifth Circuit: "the special *Sawyer*-version of the 'miscarriage of justice' exception is limited to assertions of errors of constitutional magnitude occurring at sentencing." *Callins v. Johnson,* 89 F.3d 210, 214 (5th Cir.1996), *cert. denied,* 519 U.S. 1017, 117 S.Ct. 530, 136 L.Ed.2d 416 (1996); *Fearance v. Scott,* 56 F.3d 633, 637–38 (5th Cir.1995), *cert. denied,* 515 U.S. 1153, 115 S.Ct. 2603, 132 L.Ed.2d 847 (1995).

The Supreme Court's holding *Sawyer v. Whitley* addressed a Louisiana capital sentencing scheme that is significantly different from the Texas capital sentencing scheme. *Sawyer v. Whitley* also addressed a claim of constitutional *procedural* error occurring during the sentencing phase of a capital trial. In contrast, petitioner's final claim herein consists of an implicit assertion that, based on his allegations of jury misconduct, he is "actually innocent" of the death penalty. However, petitioner has alleged no specific facts satisfying either of these "factual innocence" standards. Because petitioner has failed to satisfy the "actual innocence" test applicable to the punishment phase of a Texas capital trial, he is not entitled to relief from his procedural defaults under the fundamental miscarriage of justice exception to the procedural default doctrine.

Insofar as petitioner attempts to put a federal constitutional gloss on his complaints of jury misconduct, petitioner has procedurally defaulted on those arguments and is not entitled to the benefits of any recognized exception to the Supreme Court's procedural default doctrine.

## VIII. *Request for Evidentiary Hearing*

■ Petitioner requests that this Court permit petitioner an evidentiary hearing. However, the AEDPA limits the circumstances in which a habeas corpus petitioner may obtain an evidentiary hearing in federal court, imposing a significant burden on petitioners who fail to diligently develop the factual bases for their claims in state court. *See Williams v. Taylor,* 529 U.S. 420, 433–34, 120 S.Ct. 1479, 1489, 146 L.Ed.2d 435 (2000), (prisoners who are at fault for the deficiency in the state court record must satisfy a heightened standard to obtain an evidentiary hearing); 28 U.S.C. § 2254(e)(2). "Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings." *Williams v. Taylor,* 529 U.S. at 437, 120 S.Ct. at 1491. Under the AEDPA, if a petitioner failed to develop the factual basis of a claim in state court, he is entitled to a federal evidentiary hearing only if (1) the claim relies on either (a) a new rule of constitutional law, made retroactive on collateral review by the Supreme Court, that was previously unavailable or (b) a factual predicate that could not have been previously discovered through the exercise of due diligence *and* (2) the facts underlying the claim are sufficient to establish by clear and convincing evidence that, but for the constitutional

viewing court's attention on the issue of whether a capital defendant could rationally have been *sentenced* to death rather than simply whether that defendant was guilty of the underlying offense of capital murder. Further supporting this view of the holding in *Sawyer v. Whitley* is the fact that *Sawyer* was decided several years before the Supreme Court's *Tuilaepa* opinion chose to use the terms "eligibility" and "selection" to distinguish two aspects of capital sentencing. In

conclusion, this Court does not believe the use of the term "eligibility decision," as employed by the Supreme Court in *Sawyer v. Whitley* to address the Louisiana capital sentencing scheme can be rationally construed as limited to the "eligibility decision" the Supreme Court described years later in *Tuilaepa.* The differences between the Texas and Louisiana capital sentencing schemes warrant a construction of the holding in *Sawyer v. Whitley* that is consistent with common sense.

error, no reasonable fact-finder would have found the petitioner guilty of the underlying offense. *Foster v. Johnson,* 293 F.3d 766, 775 n. 9 (5th Cir.2002), *cert. denied,* 537 U.S. 1054, 123 S.Ct. 625, 154 L.Ed.2d 532 (2002); *Dowthitt v. Johnson,* 230 F.3d at 757; 28 U.S.C. § 2254(e)(2).

Petitioner was afforded a full and fair opportunity to develop and litigate his claims for relief herein during his state habeas corpus proceeding. Petitioner has presented this Court with no new evidence supporting any of his claims herein that was unavailable to him, despite the exercise of due diligence, during his state habeas corpus proceeding. Petitioner does not identify any new legal theories supporting his claims for relief herein that were unavailable at the time petitioner filed and litigated his state habeas corpus claims. Petitioner does not offer any rational explanation for his failure to fully develop any and all evidence supporting his claims herein during his state habeas evidentiary hearing. Nor does petitioner identify any additional evidence which he and his state habeas counsel were unable to develop and present to petitioner's state habeas court despite the exercise of due diligence on their part. Under such circumstances, petitioner is not entitled to a federal evidentiary hearing to further develop the facts supporting his claims herein.

## IX. *Certificate of Appealability*

■ The AEDPA converted the "certificate of probable cause" that was required as a prerequisite to an appeal from the denial of a petition for federal habeas corpus relief into a Certificate of Appealability ("CoA"). *See Hill v. Johnson,* 114 F.3d 78, 80 (5th Cir.1997), (recognizing that the "substantial showing" requirement for a CoA under the AEDPA is merely a change in nomenclature from the CPC standard); *Muniz v. Johnson,* 114 F.3d 43, 45 (5th Cir.1997), (holding that the standard for obtaining a CoA is the same as for a CPC). The CoA requirement supersedes the previous requirement for a certificate of probable cause to appeal for federal habeas corpus petitions filed after the effective date of the AEDPA. *Robison v. Johnson,* 151 F.3d 256, 259 n. 2 (5th Cir.1998), *cert. denied,* 526 U.S. 1100, 119 S.Ct. 1578, 143 L.Ed.2d 673 (1999); *Hallmark v. Johnson,* 118 F.3d 1073, 1076 (5th Cir.1997), *cert. denied sub nom. Monroe v. Johnson,* 523 U.S. 1041, 118 S.Ct. 1342, 140 L.Ed.2d 502 (1998).

■ Under the AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under Section 2254, the petitioner must obtain a CoA. *Miller–El v. Cockrell,* 537 U.S. 322, 335–36, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003); 28 U.S.C. § 2253(c)(2). Likewise, under the AEDPA, appellate review of a habeas petition is limited to the issues on which a CoA is granted. *See Crutcher v. Cockrell,* 301 F.3d 656, 658 n. 10 (5th Cir.2002), (holding that a CoA is granted on an issue-by-issue basis, thereby limiting appellate review to those issues); *Jones v. Cain,* 227 F.3d 228, 230 n. 2 (5th Cir.2000), (holding the same); *Lackey v. Johnson,* 116 F.3d 149, 151 (5th Cir.1997), (holding the scope of appellate review of denial of a habeas petition limited to the issues on which CoA has been granted). In other words, a CoA is granted or denied on an issue-by-issue basis, thereby limiting appellate review to those issues on which CoA is granted alone. *Crutcher v. Cockrell,* 301 F.3d at 658 n. 10; *Lackey v. Johnson,* 116 F.3d at 151; *Hill v. Johnson,* 114 F.3d at 80; *Muniz v. Johnson,* 114 F.3d at 45; *Murphy v. Johnson,* 110 F.3d 10, 11 n. 1 (5th Cir.1997); 28 U.S.C. § 2253(c)(3).

A CoA will not be granted unless the petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke,* 542 U.S. 274, ——, 124 S.Ct. 2562, 2569, 159 L.Ed.2d 384 (2004);

*Miller–El v. Cockrell,* 537 U.S. at 336, 123 S.Ct. at 1039; *Slack v. McDaniel,* 529 U.S. 473, 483, 120 S.Ct. 1595, 1603, 146 L.Ed.2d 542 (2000); and *Barefoot v. Estelle,* 463 U.S. 880, 893, 103 S.Ct. 3383, 3394, 77 L.Ed.2d 1090 (1983). To make such a showing, the petitioner need *not* show that he will prevail on the merits but, rather, demonstrate that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. *Tennard v. Dretke,* —— U.S. at ——, 124 S.Ct. at 2569; *Miller–El v. Cockrell,* 537 U.S. at 336, 123 S.Ct. at 1039; *Slack v. McDaniel,* 529 U.S. at 484, 120 S.Ct. at 1604; and *Barefoot v. Estelle,* 463 U.S. at 893 n. 4, 103 S.Ct. at 3394 n. 4. This Court is authorized to address the propriety of granting a CoA *sua sponte. Alexander v. Johnson,* 211 F.3d at 898.

■ The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the District Court has disposed of a claim. If this Court rejects a prisoner's constitutional claim on the merits, the petitioner must demonstrate that reasonable jurists could find the court's assessment of the constitutional claim to be debatable or wrong. "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller–El v. Cockrell,* 537 U.S. at 338, 123 S.Ct. at 1040 (*quoting Slack v. McDaniel,* 529 U.S. at 484, 120 S.Ct. at 1604). *Accord, Tennard v. Dretke,* 542 U.S. at ——, 124 S.Ct. at 2569. In a case in which the petitioner wishes to challenge on appeal this Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or

lack of exhaustion, the petitioner must show that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* whether this Court was correct in its procedural ruling. *See Slack v. McDaniel,* 529 U.S. at 484, 120 S.Ct. at 1604, (holding that when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner shows that reasonable jurists would find it debatable whether (1) the claim is a valid assertion of the denial of a constitutional right and (2) the district court's procedural ruling was correct).

■ In death penalty cases, any doubt as to whether a CoA should issue must be resolved in the petitioner's favor. *Cardenas v. Dretke,* 405 F.3d 244, 248 (5th Cir. 2005); *Miller v. Dretke,* 404 F.3d 908, 913 (5th Cir.2005); *Martinez v. Dretke,* 404 F.3d 878, 884 (5th Cir.2005); *Bigby v. Dretke,* 402 F.3d 551, 557 (5th Cir.2005); *Matchett v. Dretke,* 380 F.3d 844, 848 (5th Cir.2004), *cert. denied,* —— U.S. ——, 125 S.Ct. 1067, 160 L.Ed.2d 1074 (2005).

Petitioner is entitled to a CoA with regard to this Court's determination that his initial federal habeas corpus petition was untimely filed. While there is no legitimate basis for second-guessing this Court's conclusion that petitioner's federal habeas corpus petition was untimely filed, reasonable jurists could easily disagree over whether petitioner is entitled to equitable tolling of the AEDPA's one-year statute of limitations by virtue of the Texas Court of Criminal Appeals' appointment of a cancer-stricken attorney to represent petitioner and that court's failure to timely investigate when that attorney failed to timely comply with that court's directive regarding the filing of a state habeas corpus application on petitioner's behalf.

Reasonable jurists might also disagree over whether petitioner is entitled to equi-

table tolling of the AEDPA's limitations period for the duration of the period of time this Court granted petitioner's federal habeas counsel to prepare and file petitioner's initial federal habeas corpus petition. In circumstances such as petitioner's reasonable jurists might conclude that, having appointed counsel to represent petitioner herein and then having set deadlines for the filing of a federal habeas corpus petition on petitioner's behalf, this Court assumed a supervisory responsibility for ensuring the timely filing of a federal habeas corpus petition on petitioner's behalf. Alternatively, reasonable jurists might conclude that this Court is obligated to equitably toll the AEDPA's limitations period for at least those periods of time during which this Court granted petitioner's various motions for extension of time herein.

Viewed in proper context, there is no basis for disagreement among jurists of reason with regard to this Court's alternative disposition of the merits of petitioner's first through seventh claims for relief herein. None of petitioner's ineffective assistance claims satisfy either prong of *Strickland* and his *Brady* claim borders on the legally frivolous. The Supreme Court's holding in *Jones* completely forecloses petitioner's seventh claim herein.

This Court's conclusion that petitioner procedurally defaulted on his eighth and final claim herein, however, is subject to a different resolution by reasonable jurists. The Fifth Circuit has held that a federal district court may raise the issue of procedural default *sua sponte*. *Johnson v. Cain*, 215 F.3d 489, 495 (5th Cir.2000); and *Magouirk v. Phillips*, 144 F.3d 348, 358 (5th Cir.1998). Nonetheless, respondent did not specifically assert the defense of procedural default with regard to petitioner's final claim herein and reasonable jurists might well disagree over the propriety of this Court's discretionary decision to address procedural default in such a context, even if only in an alternative holding.

Therefore, petitioner is entitled to a CoA with regard to (1) whether this Court properly dismissed his federal habeas corpus petition as untimely pursuant to the AEDPA's statute of limitations and (2) whether this Court properly held, in the alternative, that petitioner procedurally defaulted on his final claim for relief herein. Petitioner is entitled to a CoA with regard to no other issues in this cause.

Accordingly, it is hereby **ORDERED** that:

1. Respondent's motion to dismiss petitioner's federal habeas corpus petition as untimely, filed November 20, 2002, docket entry no. 12, is **GRANTED**; all of the petitioner's claims herein are **DISMISSED AS UNTIMELY.**

2. Alternatively, all relief requested in petitioner's amended federal habeas corpus petition, filed September 24, 2002, docket entry no. 7, is **DENIED.**

3. Petitioner's request for an evidentiary hearing is **DENIED.**

4. All other pending motions are **DISMISSED AS MOOT.**

5. Petitioner is **GRANTED** a Certificate of Appealability with regard to the issues of (1) whether this Court properly dismissed his federal habeas corpus petition as untimely pursuant to the AEDPA's statute of limitations and (2) whether this Court properly held, in the alternative, that petitioner procedurally defaulted on his final claim for relief herein; in all other respects, petitioner is **DENIED** a Certificate of Appealability.

6. The Clerk shall prepare and enter a Judgment in conformity with this Memorandum Opinion and Order.